**Timothy TAYLOR, Plaintiff–Appellant,**

v.

**MICHIGAN DEPARTMENT OF CORRECTIONS, et al., Defendants–Appellees.**

**No. 94–1479.**

United States Court of Appeals, Sixth Circuit.

Oct. 26, 1995.

Timothy Taylor, Jackson, MI, pro se.

Daniel E. Manville, Ann Arbor, MI, for Plaintiff-Appellant.

Thomas E. McClear, Donald L. Allen, Office of the Attorney General, Corrections Division, Lansing, MI, for Defendant-Appellee.

Before: MERRITT, Chief Judge; KEITH and WELLFORD, Circuit Judges.

MERRITT, C.J., delivered the opinion of the court, in which KEITH, J., joined. WELLFORD, J. (pp. 84–88), delivered a separate dissenting opinion.

MERRITT, Chief Judge.

Plaintiff appeals the grant of summary judgment in this § 1983 action in favor of the remaining defendant, Dale Foltz, the former Warden of the state prison of southern Michigan. The heart of plaintiff's Eighth Amendment claim is that Warden Foltz knew about the risk of sexual assault in the camp program to small, vulnerable-looking prisoners such as plaintiff and neither had a policy to identify and screen out those potential transferees who would not be safe in the camp nor created guidelines for prison staff to follow when screening inmates for transfer. The record shows that the prisoner has introduced sufficient evidence to present a jury question about (1) whether Warden Foltz knew that conditions throughout the Michigan prison system and particularly at Camp Pugsley posed a substantial risk of serious harm to prisoners like plaintiff; (2) whether he knew that there was effectively no procedure in place to protect vulnerable inmates from being transferred to dangerous conditions; and (3) whether in the face of this knowledge he acted with deliberate indifference—that is, disregarded a risk of harm of which he was aware—by failing to adopt reasonable policies to protect inmates like Taylor. The prisoner has, therefore, introduced sufficient evidence to defeat a motion for summary judgment on his Eighth Amendment claim. We reverse the grant of summary judgment and remand the case for further proceedings. Furthermore, we hold that the district court erred by refusing the report of the court appointed expert before ruling on the motion for summary judgment. Upon remand, we instruct the district court to order the preparation of this report.

## I. Background

The plaintiff in this case, Timothy Taylor, is a prisoner within the Michigan Department of Corrections. He is five foot tall, 120

pounds, is mildly mentally retarded with an IQ of 66, has youthful looking features, and has a seizure disorder. Taylor was imprisoned for larceny. The plaintiff's presentence report contained the following admonition:

It is strongly recommended that prison personnel read the attached evaluation from the Social Security Administration, get a copy of the Forensic Center examination if possible, and *very carefully* read the medical information provided by the nurse from the Kalamazoo County Jail.

*Note:* Also, this offender has attempted suicide in the past, by slitting his wrists and drinking bleach. (emphasis in original)

In addition to the presentence report, a psychological evaluation of the plaintiff was conducted by a prison clinician at the Michigan Department of Correction's Reception and Guidance Center. The report characterized Taylor as "a rather peculiar and quite impoverished individual who could be easily disorganized under stress conditions." The psychologist believed that Taylor "has problems in the psychosexual area as well as cognitively and affectively...." The psychologist concluded that Taylor

is a rather unstable individual with serious problems in a number of areas, and there is a high likelihood he will become a serious management problem while institutionalized. Simply, the stress of entering the institution may be enough to result in acting out and causing a deterioration in his already limited defenses and coping skills.

Taylor argues that these reports and evaluations, contained in his prisoner file, indicate that he belonged to a class of prisoners likely to be a target of sexual pressure in prison and that he could easily be in danger if placed in the general prison population.

Beginning in September 1984, Taylor resided in the Trustee Division of Jackson Prison, a minimum security facility that provides inmates with their own individual cells. On June 12, 1985 the plaintiff was transferred to Camp Pugsley by an order that was drafted, approved, and carried out in one day with no advance warning to the plaintiff. The writ-

ten comments in the transfer order state that plaintiff volunteered for the transfer; however, the code at the top of the order reflects that the reason for transfer was "program needs." Plaintiff maintains that his transfer was motivated by an acute need for bedspace due to overcrowding and new arrivals, and that the transfer was taken in deliberate disregard of plaintiff's safety.[1] Camp Pugsley is also a minimum security facility, but the conditions of confinement are markedly different than those at the Trustee Division. The Camp houses prisoners in a dormitory style barracks, with approximately 60 inmates to a room, rather than private cells. At Camp Pugsley, plaintiff was given a bunk in a converted gymnasium. Soon after his transfer, Taylor was raped by another inmate. Plaintiff argues that the Warden's failure to establish a policy or implement a procedure that would protect vulnerable inmates from transfers to unsafe prisons amounted to deliberate indifference. *See Farmer v. Brennan,* — U.S. —, —, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) (For an Eighth Amendment claim, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

This is the second time this case has come before us. In *Taylor v. Michigan Dept. of Corrections,* the panel held that "[a]lthough there was no binding Supreme Court or Sixth Circuit precedent in 1985 to the effect that it was unlawful to transfer small, vulnerable-looking prisoners to unstructured prison camps, the unlawfulness of such an action was apparent in light of pre-existing precedent." 14 F.3d 602, 1993 WL 533470, at *3 (6th Cir. December 22, 1993) (Wellford, J., concurring in part and dissenting in part). The panel, however, declined to address Foltz's contention that even if the unlawfulness of such a transfer was clearly established in 1985, he still was entitled to qualified immunity. Foltz argued that qualified immunity was appropriate because he had no personal involvement in the decision to transfer Taylor, having properly delegated that

---

1. Warden Foltz conceded during his deposition that in 1985–86 the prison was overcrowded and admitted that when he received an order that a certain number of inmates be transferred, he was required to find the number of people and transfer them by that date. *See* J.A. at 261.

authority to his subordinates. The panel explained that this contention really went to the merits of plaintiff's Eighth Amendment claim and concerned whether Foltz was deliberately indifferent to plaintiff's constitutional rights. In a footnote, the panel opined that the recent decision in *Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir.1992), "may be determinative of plaintiff's Eighth Amendment claim against defendant Foltz." *Taylor*, at \*4 n.3. *Gibson* was a case brought by the widow of an inmate. The inmate had been stabbed and killed while in prison. The widow sued Warden Foltz, among other prison officials, claiming that Foltz was deliberately indifferent to inmate safety because he failed to update prison policies intended to protect inmates and staff members and because he failed to follow recommendations in studies showing that a threat of violence existed at the state prison of southern Michigan. The *Gibson* panel held that "[a]lthough Foltz and the other defendants were in a position to monitor the conditions at the prison, the defendants' alleged failure to lessen the threat of violence within the prison does not rise to the level of wantonness that is required to find an Eighth Amendment violation." *Gibson*, 963 F.2d at 854. The panel explained:

> There was no evidence that the defendants knew that Gibson was in danger or that any specific dangerous condition existed on 4 Block East. Failure to supervise adequately, especially without a showing that the defendants were aware that subordinates had failed to carry out prison policies, does not constitute a wanton infliction of pain.

*Id.*

When the instant case was remanded, the district court entertained a second motion for summary judgment. Citing *Gibson v. Foltz*, the court held that "there was an established prison policy directive that dictated a review of files by counselors and deputy wardens before issuance of a transfer order." *See* J.A. at 291 n.5. Moreover, the district court held that "[t]here is no evidence that Foltz was aware that his subordinates were not properly reviewing transfer orders generally or that plaintiff's file in particular had been inadequately reviewed." *See* J.A. at 290. The court concluded that if there were any deliberate indifference in this case, it was on the part of Foltz's subordinate and a claim would have to be pursued against that person. The subordinate in question, however, had been dismissed from the case earlier for lack of service.

## II. Standard of Review

We review the district court's grant of summary judgment de novo, using the same standard as that used by the district court. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir.1993). When deciding a motion for summary judgment, a district court should view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The most recent Supreme Court pronouncement on Eighth Amendment claims arising from unconstitutional conditions of confinement is *Farmer v. Brennan*, — U.S. —, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). That case also involved the rape of an inmate. The plaintiff in that case, a preoperative transsexual, was transferred from a Federal Correctional Institute to a penitentiary and raped soon after his arrival. The plaintiff claimed that the wardens and officials in the two prisons acted with deliberate indifference to the plaintiff's safety in violation of the Eighth Amendment because they knew that the penitentiary had a violent environment and a history of inmate assaults and that plaintiff would be particularly vulnerable to sexual attack if placed in the general inmate population. The Supreme Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at —, 114 S.Ct. at 1979.

## III.  Analysis

### A.  *A genuine issue of material fact exists about Foltz's awareness of his subordinates' failure to review properly transfer orders.*

■ The issue is whether there is enough evidence in the record that would allow a reasonable jury to conclude that Warden Foltz failed to take reasonable steps to ensure that vulnerable inmates like plaintiff would not be transferred to a facility where a substantial risk of serious harm existed. Foltz had responsibility for reviewing and approving all transfers of prisoners from the State Prison of Southern Michigan, including transfers from the Trustee Division, and it was his responsibility to implement procedures that would protect vulnerable inmates from dangerous transfers. Regulations allowed Foltz to delegate the authority to sign his name on the transfers. Foltz stated that normally the deputy wardens of each complex could sign the transfers. Foltz's testimony from his own deposition reveals that he was aware that his direct designees were redelegating his authority over transfers to lower echelon prison staff without any explicit authorization to do so, that he was not even sure of the procedures for approval of transfers, and that he had no review procedures to determine whether his authority was being abused. *See* J.A. at 245–47, 260.[2] His testimony certainly presents a jury question

about the existence and adequacy of reasonable transfer procedures.

Although Foltz indicated in his appellate brief that he had delegated his authority over transfers to the deputy wardens at each complex, Foltz was unable to identify whose initials appeared on the order. *See* J.A. at 245. There has been no evidence that the initials belonged to Charlie Anderson, the Deputy Warden. Plaintiff suggests that the initials by Foltz's signature could have been placed there by the Assistant Resident Unit Manager. *See* J.A. at 199 n.28; *see also* Plaintiff's brief at 22. Exactly whose initials appear on the order is disputed, but assuming for purposes of this appeal, as we must, that they are not Charlie Anderson's initials, this indicates that the defects in the transfer process affected Taylor's transfer. Contrary to the findings of the district court, a reasonable jury could conclude that Foltz's own testimony indicates that the operating procedures in reviewing and authorizing transfers were defective and that the defendant was aware of his subordinates' failure to review prison files before authorizing a transfer.

■ Defendant argues that the fact that he delegated responsibility over transfers to subordinates absolves him of liability for plaintiff's injuries. Foltz maintains that "plaintiff cannot establish liability based on failure to adequately supervise." Defendant's brief at 6. It is true, as the Supreme

---

2. Excerpts from Foltz's deposition raise a question about whether the transfer process was constitutionally defective:

> Q:  Do you know the procedure that would be undertaken in regards to concerning whether an inmate should be transferred or not?  Who would first—do the first step?
> A:  It would be the resident unit manager or his assistant—would be the initiator of a transfer.
> Q:  And were they supposed to review, like, the inmate's file to determine whether they met a certain criteria?
> A:  I don't recall.
> Q:  If a resident unit manager had filled out a transfer order—and it looks like on Exhibit 1 on the left-hand side, that a Bogan, ARUM—that's assistant resident unit manager; right?
> A:  Yes.
> Q:—had filled out—initially filled out this form. When it was sent to the deputy warden or somebody that you had designated to sign— you know, to approve the transfers, would they

> automatically just approve it because the ARUM had prepared the order, or would they be required to take additional steps?
> A:  I don't recall what—how they operated on that.
> Q:  Well, what would you expect, since you had designated the authority?
> A:  I would—the preparer of the transfer would have the records in front of them and would pretty well have the authority to tell me what—which direction to transfer a person.  I would not review the files.
> Q:  And you would not expect, like, your deputy warden to look at the institutional file before approving a transfer?
> A:  Only if the person preparing it made some special statement on there that they should look at some special situation.
> . . .
> Q:  But my question is, did you have any review procedures to insure that that order or authority that you delegated was not being abused by the person that had it?
> A:  No.

Court has stated, that in a § 1983 action liability cannot be based on a theory of respondeat superior. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). However, this does not automatically mean that a supervisor can never incur liability under § 1983. As this Court made clear in *Bellamy v. Bradley*:

> Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*

729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) (emphasis added). In the instant case, Foltz's own deposition showed that he was aware of and at least acquiesced in the conduct of his subordinates in approving transfers without adequately reviewing the inmate's record.

Foltz is not merely a supervisor, but is the official directly responsible both for transfers and for adopting reasonable transfer procedures. This case has more in common with the Sixth Circuit case of *Hill v. Marshall*, 962 F.2d 1209 (6th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993), than it does with *Monell*. Hill was an inmate who was diagnosed positive for the tuberculin bacteria. After he was transferred to another facility, he was repeatedly denied the preventive medicine previously prescribed to him. Hill filed a § 1983 action against certain officials at the Southern Ohio Correctional Facility, including Terry Morris, the Deputy Superintendent of Treatment. Just as in the present case, Morris objected to the imposition of liability, arguing that he could not be held liable for actions taken in his supervisory capacity and that the plaintiff did not plead and prove Morris' direct personal involve-

ment. The Sixth Circuit rejected this argument, stating:

> Here, by contrast, Morris is charged with abandoning the specific duties of his position—reviewing and responding to inmates' complaints about medical needs—in the face of actual knowledge of a breakdown in the proper workings of the department. Hill does not seek to hold Morris vicariously liable for the head nurse's misconduct. Rather, Morris *personally* had a job to do, and he did not do it. His failure to do his job resulted directly in a violation of the plaintiff's Eighth Amendment right.

962 F.2d at 1213.

■ In the instant case Foltz is charged with abandoning the specific duties of his position—adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers—in the face of actual knowledge of a breakdown in the proper workings of the department. A jury could find on the facts that Foltz personally had a job to do, and that he did not do it. A jury could find that the fact that Foltz was under constant pressure to transfer inmates due to overcrowding would not excuse his failure to adopt reasonable policies to insure that the transferees were not placed in grave danger of rape. *See Redman v. County of San Diego*, 942 F.2d 1435, 1446–47 (9th Cir.1991) (holding that where a supervisor implements an unconstitutional policy, liability is direct, not vicarious), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). In sum, a triable question exists about whether Foltz properly discharged his duty.

■ Foltz's related argument, that he cannot be liable because he had no personal knowledge of Taylor's particular vulnerabilities to sexual assault, also fails. *Farmer* makes it clear that the correct inquiry is whether he had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be. In *Farmer*, the defendants successfully argued in the district court that they did not possess the required knowledge of potential danger because plaintiff never expressed any safety concerns to them. In the course of reversing

and remanding the case, the Supreme Court stated:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.... [I]t does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. See Brief for Respondents 15 (stating that a prisoner can establish exposure to a sufficiently serious risk of harm "by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates").

*Farmer*, —— U.S. at ——, 114 S.Ct. at 1982 (citation omitted). Similarly, in *Butler v. Dowd*, the Eighth Circuit affirmed the trial court's refusal to grant the prison superintendent, Dowd, a j.n.o.v. even though one of the plaintiffs testified that the superintendent probably did not know about the plaintiff's specific situation until after the sexual assault occurred. 979 F.2d 661, 667 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2395, 124 L.Ed.2d 297 (1993). The court found persuasive that Dowd had signed an affidavit that acknowledged that there is a particular type of inmate who is vulnerable to attack:

> Plaintiffs in this action are typical of the type of inmate who normally receives such intimidation from other inmates. Plaintiffs exhibit generally passive personalities and are unable to stand up to these inmates threatening them. It is likely that plaintiffs will be subject to such treatment by other inmates wherever they go.

*Id.* at 667 (quoting affidavit).

In 1974, Foltz testified that small, youthful prisoners are especially vulnerable to sexual pressure. *See People v. Harmon,* 53 Mich. App. 482, 485, 220 N.W.2d 212, 214 (1974), *aff'd* 394 Mich. 625, 232 N.W.2d 187 (1975). Therefore, a reasonable jury could conclude that the information in Taylor's file should have alerted a reviewing official that Taylor belongs to a class that is particularly vulnerable to sexual assault. Accordingly, it is a question for the jury. This is the position that the Magistrate took in her Report and Recommendation, *see* J.A. at 69, but it was rejected by the District Court.

Additionally, plaintiff contends that Foltz actually knew him, thus satisfying Foltz's own self-styled test of knowledge. While it is true that Foltz did not personally authorize the transfer to Camp Pugsley, defendant has introduced evidence that he personally ordered Taylor's transfer a year earlier from a medium security facility to a minimum security facility. *See* J.A. at 171. During his deposition, Foltz testified that he reviewed prisoners' files if he actually authorized the transfer. *See* J.A. at 262. Drawing all inferences in favor of the plaintiff, as we must on this motion for summary judgment, the jury could find that Foltz had direct knowledge of plaintiff's characteristics because he personally reviewed Taylor's file the year before the transfer to Camp Pugsley.

**B.** *The danger to Plaintiff at Camp Pugsley is a disputed issue of material fact*

■ Defendant also contends that Taylor has not introduced evidence proving that Camp Pugsley had more incidents of sexual assault than his former prison. Plaintiff counters that the court appointed expert would have addressed this issue in his report, but the District Court decided that it could rule on a summary judgment motion without the report. The Magistrate Judge's careful report and recommendation unequivocally states that the incidence of rape at the Camp as compared to the prison is an open question of fact:

> Plaintiff has shown that Defendant Foltz had knowledge of the pervasive risk of harm in the prison system. Although there has been no statistics [sic] submitted by either party as to whether or not there existed a pervasive risk of harm in the particular camp where the sexual assault against Plaintiff occurred, *an expert has been appointed by this Court to testify at trial regarding this issue.*

J.A. at 68 (emphasis added).

The Court's expert never got a chance to submit his report. After the case was re-

manded by the Sixth Circuit following its decision denying Foltz qualified immunity, the District Court entertained a second summary judgment motion. Plaintiff's counsel asked the court to wait for the expert's report before ruling, and persuasively argued that the report was crucial to the question of plaintiff's danger at Camp Pugsley. In his brief in opposition to the defendant's second motion for summary judgment, the plaintiff plainly states: "The one major area that the expert must review is whether a potential for harm existed at Camp Pugsley in June of 1985. This can only be done through reviewing documents and other matters by the expert." J.A. at 208. The district court based its decision on whether Foltz was aware that his subordinates were not properly reviewing prisoner files before issuing transfer orders, not whether the camp was a more dangerous setting for the plaintiff than the prison. The district court evidently thought that the expert's testimony would be relevant on the latter issue or it would not have agreed with the magistrate and ordered the expert's appointment in the first place. As this Court emphasized in *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* "Mindful of the burden on the nonmoving party to produce evidence showing the existence of a genuine issue of material fact, summary judgment should not be granted unless the nonmoving party has had the opportunity to discover information essential to opposition." 936 F.2d 889, 893 (6th Cir.1991).

The report is important not only to establish whether the camp was in fact more dangerous than the prison but also to provide additional evidence of Warden Foltz's knowledge. The Supreme Court explained in *Farmer* that a jury can legitimately infer that a prison official had knowledge from evidence that the risk was well-known:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

— U.S. at ———–———, 114 S.Ct. at 1981–82 (citation omitted).

The record is clear that plaintiff, prior to summary judgment and again on appeal, repeatedly requested the preparation of the report. The record also indicates that the comparative risk of sexual assault at Camp Pugsley is a disputed issue of material fact. Therefore, the expert must be given an opportunity to conduct an investigation and submit his report.

Even if the plaintiff had not attempted to submit more evidence of the risk of sexual assault at the camp, the record still presents a jury question about whether, for prisoners like plaintiff, (1) the conditions at the camp were clearly more dangerous than at the prison, (2) the Warden must have known this, and (3) he was deliberately indifferent to the risk because he did nothing to protect vulnerable prisoners from unsafe transfers.

A review of the record reveals a prison system in crisis. In her Report and Recommendation, the Magistrate reviewed portions of the report prepared by the Michigan State Police in 1973. Portions of the report had already been admitted as evidence in *Redmond v. Baxley,* 475 F.Supp. 1111, 1122 (E.D.Mich.1979) and *Roland v. Johnson,* Case No. 84–CV–7544–AA (E.D.Mich). The Magistrate found that the "report established that sexual violence was pervasive in [Michigan Department of Correction's] prison system and dealt with both the prison camps and state prisons." J.A. at 67. Moreover, the Magistrate noted that the Magistrate Judge in the *Johnson* case indicated that the Michigan State Police Report contained sufficient information to determine whether Warden Foltz "had notice that there was a pervasive problem of sexual pressuring and violence." J.A. at 67. The plaintiff introduced into the record a letter dated October 29, 1982, to Governor Milliken, from the Department of Justice, Civil Rights Division. That letter detailed the results of an investigation of prison conditions in Michigan by five outside, independent experts. Among the conditions which the experts believed subjected

the inmates to grievous harm in violation of their Eighth Amendment rights was the inadequate security provided to inmates against "physical and sexual assault, other violence, and extortion." J.A. at 278. Plaintiff maintains that Warden Foltz was sent a copy of that letter.

Warden Foltz arguably knew about the problem of widespread sexual assaults and knew that smaller, youthful prisoners were more vulnerable to attack than others. He also knew that the camps were less structured than the prisons and that conditions of confinement were more open in the camps' barracks-style lodging than in Trustee Division. From this, a reasonable jury could have concluded that Foltz knew that the risk of sexual assault was inherently greater at the camp. As the *Farmer* Court stated, "Whether a prison official had the requisite knowledge of a substantial risk [is] a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." —— U.S. at ——, 114 S.Ct. at 1981. Because this is a question of fact for the jury, summary judgment is not appropriate.

## IV. Conclusion

In 1910 Winston Churchill coined a phrase and recognized an obvious truth when he said that the "treatment of crime and criminals is one of the most unfailing tests of civilization of any country."[3] In *Farmer*, the Supreme Court applied the same idea to prison rapes, saying that "gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e],' any more than it squares with 'evolving standards of decency.'" *Farmer*, —— U.S. at ——, 114 S.Ct. at 1977 (citations omitted). Prisons are dangerous places because they house dangerous people in congested conditions. But the Eighth Amendment to the Constitution mandates that prison officials maintain humane conditions of confinement and take reasonable measures to guarantee the safety of inmates. Their duty includes protecting prisoners from violence at the hands of other prisoners: "[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.*

Our review of the record in this case indicates that there are disputed questions of material fact concerning whether Warden Foltz had any procedures in place to review transfer orders to insure that his authority over transfers was not being abused and to insure that inmates' files were being properly examined before transfer. Triable issues of fact also exist as to whether plaintiff falls into that category of inmates especially vulnerable to sexual assault, whether plaintiff was subjected to a substantial risk of serious harm by his transfer to Camp Pugsley, whether Camp Pugsley was in fact more dangerous to prisoners like Taylor than Jackson Prison, and whether Warden Foltz knew of the risk that the camp presented but failed to take reasonable steps to insure that his vulnerable wards were not transferred there. To assist in answering these questions, the district court is instructed to allow the court-appointed expert to prepare his report. We REVERSE the grant of summary judgment to the defendant and REMAND the case for further proceedings consistent with this opinion.

So ordered.

WELLFORD, Circuit Judge, dissenting.

In my view, Taylor has failed to present any evidence that would support a finding that Warden Foltz acted with deliberate indifference, and I would AFFIRM the district court's grant of summary judgment.

Taylor argues that Foltz, as the prison warden, had actual knowledge of his vulnerability to sexual assault from his inmate file, and that Foltz acted with deliberate indifference in ordering his transfer to the barracks-type prison. Taylor's file contained a description of his physical characteristics, including his size, a mild mental retardation,

---

**3.** Addressing the issue of prison reform, Winston Churchill made these remarks before the House of Commons in 1910 while he was Home Secretary.

and that he has a seizure disorder and an adjustment disorder.[1] In addition, Taylor's file contained psychological reports that had been prepared as part of his presentence report as was described in the majority opinion. The report warned that "[t]his offender's mental limitations are certainly factors in his past behavior and will affect his future adjustment."

Foltz, however, denies any knowledge about Taylor's allegedly particular vulnerabilities to sexual assault. During the period in dispute, Warden Foltz was responsible for overseeing three prison complexes. He claims that he delegated responsibility for transfer decisions between same-level prisons to his deputy wardens at each of the prison complexes for which he was responsible. Thus, although his signature appears on Taylor's transfer orders, it was placed there by a deputy warden who also placed his initials on the transfer.

Although the Eighth Amendment "does not mandate comfortable prisons ... neither does it permit inhumane ones." *Farmer v. Brennan*, — U.S. —, —, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citations omitted). Not "every injury suffered by one prisoner at the hands of another [however] translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at —, 114 S.Ct. at 1977. To bring a successful claim in these prison conditions cases, the inmate must show that the prison officials acted (or failed to act) with "deliberate indifference" to his safety or welfare. *Id.*

To meet the deliberate indifference standard, the inmate must show the prison official had "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (importing a subjective standard into the "deliberate indifference" test). Recently, in *Farmer*, the Supreme Court has held that the test is a subjective one. As pointed out

by the majority, the Court stated that a "prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference.*" *Farmer*, — U.S. at —, 114 S.Ct. at 1979 (emphasis added). Simply failing to alleviate a significant risk that he should have perceived but did not is insufficient to ground liability. *Id.*

To survive a summary judgment motion, therefore, Taylor must present some evidence that Warden Foltz failed to act despite his knowledge of a substantial risk of harm. Taylor presents two possible theories on which to ground direct liability. First, Taylor argues that a jury could infer from the evidence in his inmate file that Foltz knew of Taylor's vulnerabilities to sexual assault, but chose to disregard these factors when ordering the transfer. Alternatively, Taylor argues that Warden Foltz knew generally that small, youthful looking prisoners were more likely to be subject to prison assault but was indifferent to these risks and failed to draft policies that protected these inmates from transfers to unsafe prisons.

As to Taylor's first argument, he has failed to present enough evidence that would allow a reasonable jury to conclude Warden Foltz knew of Taylor's particular vulnerabilities to sexual assault. Although Foltz had access to Taylor's file, Foltz presented an affidavit that claimed he had delegated responsibility for same-level transfers to the deputy wardens at each of the prison complexes for which he was responsible. Taylor has not presented any information to rebut this claim. On the contrary, prisoner official Bogan actually caused Taylor's transfer as a "Camp volunteer" to Camp Pugsley.[2] J/A at 268, Exh. 1.

---

1. It is not apparent from his inmate file that Taylor has youthful looking features, thus allegedly more susceptible to sexual assault.

2. The majority concedes that Foltz did not personally authorize the transfer to Camp Pugsley. It concludes, however, that a jury could find Foltz knew of Taylor's particular vulnerabilities

to sexual assault because he had personally reviewed the file the previous year when transferring Taylor from a medium-security facility to a minimum security facility.

I find that proposition unconvincing. Foltz was responsible for supervising three prison complexes that house approximately 5,000 inmates. No reasonable jury could conclude that

The effect of the majority's holding is to expose Foltz to potential liability by way of respondeat superior for the alleged misconduct of Bogan whom Taylor did not properly serve with process in this suit.[3] The theory of respondeat superior may not be used to establish liability under § 1983. *See Monell v. Department of Soc. Serv. of New York City,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

Additionally, as in *Gibson v. Foltz,* 963 F.2d 851, 853 (6th Cir.1992), plaintiff has not made a showing that Foltz acted out of "[o]bduracy or wantonness," as is required in an Eighth Amendment context. "Lack of due care for a prisoner's safety by prison officials is insufficient." *Gibson,* 963 F.2d at 853. *Gibson* makes it clear that to hold Foltz potentially liable as warden, he must have "knowledge" and thus have intended harm to the prisoner. *Id.* What has allegedly occurred, though indeed unfortunate and distressing, insofar as Foltz was concerned, did "not rise to the level of a wanton infliction of pain" or injury by him. *Id.* at 854. Again, there is *no evidence,* no allegation even, that Foltz *"knew* that [Taylor] was in danger," even though he may have had ultimate responsibility "to monitor the conditions at the prison." *Id.* at 854 (emphasis added). There was no evidence that Foltz personally was aware that Taylor was likely to be a homosexual attack victim at Camp Pugsley or that

after seeing Taylor's name on a list of inmates to be transferred, Foltz was able to recall the information he had read about Taylor the previous year and deduce that Taylor was at risk at a barracks-styled prison. Although we are required to draw every possible inference in favor of the non-moving party, we are not allowed to stack inference upon inference to preserve an issue for the jury.

3. Whether the alleged misconduct of Bogan was misconduct at all, negligent conduct, or deliberate indifference, we do not decide.

4. In another recent case, we described the law in this circuit in a case of this type:

At issue here is whether the right to be free from cruel and unusual punishment is violated where prison officials fail to segregate an inmate who has received death threats, threats of assault and arguments with another inmate in the same room. *Cf. Danese [v. Asman ],* 875 F.2d [1239] at 1243–44 [(6th Cir. 1989)]. As of

he was "aware that subordinates had failed to carry out prison policies."[4] *Id.*

*Hill v. Marshall,* 962 F.2d 1209 (6th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993), cited by the majority as authority for its decision, does not support the extension of supervisory liability under § 1983 under the facts of this case. *Hill* addresses the nursing supervisor's *"actual knowledge"* in the departmental malfunction, and notes that the supervisor *"personally"* failed to do his job. *Id.* at 1213 (emphasis added). In addition, Hill was able to offer strong proof of a *pervasive* pattern of indifference to the inmates' medical needs generally. *Id.* Morris did not do his job— "responding to inmates' complaints about medical needs"—and thus was held liable. *Id.* That situation is a far cry from Foltz's non-personal involvement in this case.

*Butler v. Dowd,* 979 F.2d 661 (8th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2395, 124 L.Ed.2d 297 (1993), also cited by the majority, again involved allegations of the deliberate indifference of the warden of that facility, with accompanying proof of a pervasive pattern of rapes in a particular prison. An almost evenly divided en banc court allowed a one dollar damages award against the warden. I likewise find *Butler* not to be persuasive under the facts of this case.

But even if we were to assume that Foltz had personally reviewed Taylor's file and,

1985, this court had decided only one case dealing with eighth amendment liability for failure to protect an inmate from assault by another inmate. In *Stewart v. Love,* 696 F.2d 43 (6th Cir.1982), an inmate, fearing for his own safety due to rumored threats of harm against him, requested and received a temporary transfer, and upon return to his original unit, informed prison administration of renewed threats, but was beaten so severely as to require hospitalization. Nonetheless, this court found mere negligence. *Marsh v. Arn,* 937 F.2d 1056, 1067 (6th Cir.1991) (footnote omitted). The unpublished decision in *Roland v. Johnson,* No. 90–1343, 1991 WL 84346 (6th Cir. May 22, 1991), cannot, of course, counter the authority of *Marsh* and *Gibson.* "[W]e have held that 'deliberate indifference' of constitutional magnitude may occur when *prison guards* fail to protect one inmate from an attack by another." *Walker v. Norris,* 917 F.2d 1449, 1453 (6th Cir.1990) (emphasis added). We have *not* held a warden similarly liable previously.

thus, had actual knowledge of the information contained therein, that information does not raise a red flag that Taylor was particularly vulnerable to sexual assault. Although the file gives Taylor's physical characteristics and age, it does not mention other characteristics (such as feminine mannerisms or homosexual orientation) that would make him more likely to be a victim of prison rape. *Cf. Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (pre-operation transsexual with feminine mannerisms). Second, the psychological reports contained within the file do not necessarily lead one to conclude that Taylor is especially vulnerable to rape. These reports describe Taylor as a "peculiar individual" and warns that he will have a difficult time adjusting to prison life. No concern is expressed in these reports about the likelihood that Taylor will be subject to sexual pressure in prison. Thus, Foltz's knowledge of the information in Taylor's file does not support the conclusion that Foltz actually knew that this defendant was particularly vulnerable to sexual assault.

Taylor's second theory of liability also must fail. He argues that Foltz knew that the category of smaller, youthful prisoners are subject to sexual pressure, but acted with "deliberate indifference" in failing to adopt transfer procedures that would prevent them from being transferred to unsafe prisons.

Indeed, Foltz had previously testified about general vulnerability of small, youthful prisoners. *People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974), *aff'd*, 394 Mich. 625, 232 N.W.2d 187 (1975). There was also evidence that a barracks-styled prison would give sexual predators more opportunities to attack these vulnerable inmates than would a single-cell facility.

But the existence of that evidence does not mean summary judgment is inappropriate in this case. As *Farmer* states, the deliberate indifference standard describes "a state of mind more blameworthy than negligence." *Farmer*, —— U.S. at ——, 114 S.Ct. at 1978. Although the inmate does not have to show

that the prison official actually intended for the harm to occur, he must show that the official *knew of* and *disregarded* the excessive risk to the inmate's health or safety. *Id.* at ——, 114 S.Ct. at 1979.

The Court's use of the term "disregard" in *Farmer* requires that the prison official (or the state) be able feasibly to alleviate the risk to the inmate.[5] I cannot agree that we should declare barracks-style prison camps unconstitutional for minimum-security prisoners or youthful, slight prisoners, or that a jury could so find. If Foltz failed to develop special procedures that would have screened small, youthful inmates to try to protect against prospective rapes, I would deem that failure to be negligent, not deliberate indifference.

What type requirements would we impose upon the warden? The factors on which Taylor bases his claim (*e.g.*, "young-looking," "small") are far too subjective on which to predicate liability. Unlike the characteristics of the pre-operative transsexual in *Farmer*, I cannot agree that Foltz was either aware of, or acquiesced in, approving a transfer, knowing that this would place Taylor in imminent danger. It is simply unreasonable to hold a warden liable for the transfer by a subordinate of a young, slight, mentally troubled prisoner to a prison camp.[6] Even if the characteristics Taylor bases his claim upon are objectively identifiable, the relevancy of this information would also depend on the characteristics of the other inmates already located at the barracks-styled facility. Even this information alone would not be conclusive; a proper analysis of an inmate's ability to protect himself, an evaluation of the inmate's muscle strength, aggressiveness, ability to make allies with other inmates, together with a variety of other unknown factors, would be required.

I would not hold the warden potentially liable as a matter of law under all the circumstances. No reasonable jury could find that Foltz was deliberately indifferent in failing to

---

**5.** The deliberate indifference standard doses not impose strict liability on prison officials. *Farmer*, —— U.S. at ——, 114 S.Ct. at 1977 (not every injury translates into constitutional liability).

**6.** There is no allegation or showing of any unusual incidence of rape in the Michigan prisons supervised by Foltz. Note the Johnson report, included in the joint appendix at 270–275.

adopt procedures to accomplish a practical and realistic impossibility taking into account the numbers of prisoners and different prison settings in Michigan.

In my view, the majority is taking a real step towards establishing strict liability against the warden in case of the rape of a youthful, troubled prisoner. It also risks imposing respondeat superior liability against Foltz. There was nothing to prevent Taylor's properly pursuing the deputy warden or resident unit manager responsible for the actual assignment to Camp Pugsley.

Accordingly, I would **AFFIRM** the district court's decision.