Teresa J. HANDSHOE, Plaintiff–
Appellant,

v.

MERCY MEDICAL CENTER, et
al. Defendants–Appellees.

No. 00–4172.

United States Court of Appeals,
Sixth Circuit.

April 18, 2002.

442

Before KENNEDY, BOGGS, DAUGHTREY, Circuit Judges.

KENNEDY, Circuit Judge.

Plaintiff Teresa Handshoe appeals the district court's grant of summary judgment in favor of defendants Mercy Medical Center and Mercy Health System—Western Ohio [1] on her claims under the Americans With Disabilities Act, the Rehabilitation Act of 1973, Ohio Revised Code §§ 4112.02(A) and 4112.02(I), and 4112.99, and Ohio public policy. For the following reasons, we affirm the judgment of the district court.

I. Background

The following relevant facts are taken from the record, as viewed in the light most favorable to the plaintiff. Beginning in 1993, Teresa ("Terri") Handshoe, who is deaf, was employed as a Program Coordinator with Community Services for the Deaf in Springfield, Ohio ("CSD"). The position of Program Coordinator included duties such as providing community education regarding deafness, program development, client advocacy, case management services, referral services, community networking, and representing the deaf in the community. The position also included some supervisory duties, although the record is not clear as to the extent of those duties. Handshoe was responsible for the performance evaluations of her one subordinate, Pam Funderburg, the Interpreter Coordinator for CSD. Funderburg's duties included teaching sign language classes, putting together a newsletter for the deaf community, scheduling interpreter services, and providing interpreter services for Handshoe and for deaf clients. Funderburg also did some typing for Handshoe. Handshoe, in turn, was supervised by Doug Lineberger, the Executive Director of West Central Ohio Hearing and Speech Center. Lineberger also played a significant role in supervising Funderburg, given the small size of the deaf services staff and his management style. Although Handshoe would prepare performance evaluations for Funderburg, and Funderburg would "report to" Handshoe, Lineberger was also involved in Funderburg's day-to-day performance and would typically handle any discipline. Neither Lineberger nor Funderburg are deaf.

On May 1, 1995, CSD merged with defendant Mercy Medical Center and was renamed Mercy Speech and Hearing Center ("MSHC"). After the merger, Lineberger was named the director of the new MSHC. Not much changed with respect to

---

**1.** Mercy Medical Center is affiliated with Mercy Health System—Western Ohio. For purposes of this opinion, these two defendants will be referred to collectively as "Mercy." Plaintiff also named as a defendant Family Service Association ("FSA"). The district court, in the same order, also granted FSA's

motion for summary judgment. Plaintiff, however, has appealed the district court's order only insofar as it relates to the Mercy defendants. (Notice of Appeal, J.A. 488.) Thus, we will not consider here plaintiff's claims against FSA.

the deaf services organization immediately after the merger. Handshoe's and Funderburg's duties remained essentially the same. In other areas of the West Central Ohio Hearing and Speech Center, Lineberger was making changes in reporting structure. He eliminated a position known as office manager, so that all of the front office staff reported directly to him. But Lineberger had not formally changed the reporting structure of the MSHC. He had, however, taken over the task of evaluating Funderburg's performance. On June 30, 1995, and again on July 18, 1995, Lineberger completed and signed performance appraisals of Funderburg.

On June 17, 1995, Mercy sponsored a picnic for the Springfield deaf community. Both Handshoe and Funderburg were in attendance. A deaf man named Tim Medina, a friend of Handshoe's from Washington D.C., was also at the picnic. Funderburg conversed with a number of the deaf individuals in sign language. At one point, Funderburg was conversing with a thirteen-year-old deaf girl. Funderburg signed to her that she looked "old." Apparently, Funderburg meant to sign to the girl that she looked grown up, but did not know of a sign for "grown up." Medina witnessed this conversation, and interrupted Funderburg, telling her that she should have used the sign for "more mature." A dispute ensued, with Funderburg telling Medina to stop criticizing her signing, as he had also corrected her earlier in the day. Handshoe did not witness this incident, but learned of it through complaints within the deaf community. Handshoe then spoke to Funderburg about the incident and reported the situation to Lineberger.

On July 17, one month after the picnic, Medina sent a strongly-worded letter to Lineberger, with copies to other Mercy officials, Handshoe, and Funderburg. In the letter, Medina accused Funderburg of treating the deaf individuals at the picnic poorly, by ignoring them, insulting them, and berating them. He also criticized her signing skills. Lineberger thought that Handshoe was taking Medina's side, and should have provided more support to her colleague Funderburg in the matter. Lineberger spoke with other Mercy officials about the matter. At one point, he spoke with Richard Rogers, the Vice–President in charge of Human Resources, who took notes of the conversation. Rogers testified that he didn't recall whether the notes were of things he told Lineberger, or of things Lineberger told him. Later, however, he testified that they were "just notes of Doug Lineberger communicating to me." (J.A. at 886.) The notes included the following:

Has not shown the capability to supv. Pam [Funderburg].

*Demonstrated* distrust of hearing people.

9 months ago—stated—didn't trust hearing people.

Terri has made "mean" comments to Pam—as communicated to Doug. (before or after process)

has reacted angry on issues

generally—"an angry deaf person" (cumulation of issues)

*Relative to Issue*

No support—*no opinion on issue*—did not support staff

*Final Straw*

Change in reporting alignment

parallel @ this pt., they're both supv. by Doug L.

(J.A. at 774.)

On July 24, Lineberger held a meeting with Handshoe, at which he told Handshoe that her supervisory duties were being taken away, that Funderburg was now to report directly to Lineberger, and that

Funderburg would no longer assist Handshoe in her duties. A few days later, Lineberger gave Handshoe a copy of a document reviewing the items discussed at the meeting. (J.A. at 228–29.) The document contained the following notations:

— Pam Funderburg will report directly to Doug Lineberger; Terri will no longer supervise Pam

— Pam will function as your interpreter when possible and will schedule other qualified interpreters as needed

. . .

— Terri will write/compose her own correspondence, make own phone calls etc ... Pam will type + provide office support when appropriate

. . .

If you cannot perform your responsibilities as discussed, changes can be made. (J.A. at 228.) The document went on to outline Handshoe's job duties, which were otherwise substantially the same as her duties prior to the incident.

Handshoe viewed the change as a demotion, and protested. She filed a grievance and met with Richard Rogers. Rogers later met with Handshoe and Funderburg. He concluded that there were no issues of employment discrimination, but that serious communication, perception, and team relationship problems existed in the department. He recommended that Lineberger, Handshoe, and Funderburg participate in a "team building initiative" to be conducted by an outside consultant. All three agreed.

After the July 24 change in reporting structure, Mercy began receiving a series of letters from the deaf community. These letters decried Handshoe's demotion and criticized Funderburg's abilities and treatment of deaf individuals. Many of the letters were typed by Medina, although he testified that he was simply typing the first-person accounts, communicated to him through sign language or handwriting, of the deaf individuals in the community who complained to him. Copied on the letters were executive managers of Mercy, certain deaf services organizations, and a few congressmen. Medina also distributed handbills and flyers that promoted Handshoe's cause and sought the termination of Funderburg. Mercy sent Medina a letter advising him that the letters and handbills must stop or "the very existence of [the deaf services] program may be in jeopardy." (J.A. at 928.)

The relationship between the employees at MSHC continued to deteriorate. Handshoe makes several complaints about the way she was treated by Lineberger, including that he "berated" her, often gave her "writeups," frequently blamed her for problems in the department, and favored Funderburg by giving her assignments that had belonged to Handshoe. Handshoe also claims that Lineberger would use nasty body language or expressions around Handshoe, indicating that he did not want her around.

In August, 1996, Lineberger met with Funderburg and Handshoe. At that meeting, Funderburg stated that she wanted to see Medina's " 'ass' in jail." (J.A. at 221.) Handshoe questioned how Funderburg could be a neutral interpreter for Medina, given that attitude. Funderburg felt that Handshoe was questioning her professional ethics, became angry, and resigned her employment at MSHC. After her resignation, Funderburg worked as a freelance interpreter for various agencies, including MSHC. She even interpreted for Handshoe on a few occasions.

The problems between Lineberger and Handshoe apparently continued after Funderburg's departure. In late 1996, during a conversation between Lineberger and Handshoe, Handshoe was puzzled about

something Lineberger had written in a "writeup" he had given her. She asked for clarification, but Lineberger told her they would discuss it later. Handshoe testified:

> And I just, you know, simply asked for an example of what he was talking about, you know, what do you mean, what are you telling me, that I need to look for another job? Is that what you're saying to me? And he said, yeah, yeah, that's one of them. One of them. Well, then what are some of the other issues we'll discuss later? And we never did discuss them.

(J.A. at 581.)

Handshoe resigned her employment with MSHC in November, 1996. Although Handshoe had always received ratings of "adequate," "competent," or "commendable" on all categories of her performance reviews, Lineberger indicated on the Human Resources Action Request form, filed in connection with the resignation, that she was "Below Average" in sensitivity, communication, decisiveness, openness, and attendance. He also indicated that she was not eligible for re-hire, and that the open position was to be filled. MSHC filled the position, on an interim basis. Mercy then decided to enter into a contract with FSA in which the latter would take over the operation of the deaf services department. As a result, Lineberger was no longer supervising that department. When Handshoe learned of this she sought to return to her former position within the department, but was advised that there was not an opening.

## II. Analysis

We review a district court order granting summary judgment under a *de novo* standard of review, without deference to the decision of the lower court. *Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76 (6th Cir.1995); *Lake v. Metropolitan Life*

*Ins. Co.*, 73 F.3d 1372, 1376 (6th Cir.1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

Plaintiff's complaint alleges that Mercy's actions discriminated on the basis of a disability, in violation of the Americans With Disabilities Act, the Rehabilitation Act of 1973, and Ohio Revised Code §§ 4112.02(A) and 4112.02(I), and 4112.99. Plaintiff also alleges that Mercy violated Ohio public policy. The district court granted summary judgment in favor of Mercy on all claims. The court discerned four possible theories of discrimination from Handshoe's complaint and arguments to the court: 1) demotion, 2) constructive discharge, 3) refusal to [re]hire, and 4) retaliation. The court went on to reject each of these theories, holding that Handshoe did not suffer any action rising to the level of an "adverse employment action," as required by the statutes. The court also rejected plaintiff's public policy claim, noting that summary judgment may be granted on a common-law public policy claim where summary judgment has been granted as to plaintiff's discrimination claims. Further, the court rejected Handshoe's argument that the notes taken by Rogers including the statement "angry deaf person" constituted direct evidence of discrimination.

## A. Direct Evidence of Discrimination

■ In granting summary judgment, the district court rejected Handshoe's assertion that Rogers' notes constituted direct evidence of discrimination. The court found that the notes were not taken by the decision-maker, and that, in any event, the

notes were "too ambiguous" to support the inference that the change in reporting structure was motivated by a discriminatory animus. (J.A. at 477). We agree with Handshoe that the record supports the inference that the notes were taken by Rogers of statements made by Lineberger, who was unquestionably the decision-maker in changing the reporting structure. Whether the notes were too ambiguous to support an inference of discriminatory animus is a closer question. We need not answer that question, however, because we conclude that the district court properly found Handshoe's evidence insufficient to support a finding that she suffered a materially adverse employment action. Even where there is direct evidence of discriminatory comments or remarks, the plaintiff may not prevail unless she shows an actionable injury. *See Antonucci v. Goodyear Tire & Rubber Co.*, No. 93–3135, 1994 WL 49569, at *3 (6th Cir., Feb.17, 1994) (unpublished opinion). As discussed below, Handshoe did not suffer a materially adverse action.

### B. Materially Adverse Employment Action

On appeal, Handshoe claims that she suffered from four distinct adverse actions: 1) demotion, 2) discipline, 3) harassment, and 4) constructive discharge. We will consider each of these theories in turn.

### 1. Demotion

■ Handshoe argues that the action taken on July 24, 1995, and formalized in writing a few days later (J.A. at 228–29) was a demotion. The document formalizing the "change in reporting structure" stated that Handshoe would "no longer supervise" Funderburg, evincing an intent to remove whatever supervisory authority that Handshoe held over Funderburg. Yet, it is not at all clear from the record what those powers entailed. As of July 24, Handshoe was no longer reviewing the performance of Funderburg. Although Funderburg did some typing and interpreting for Handshoe, it does not appear from the record that Handshoe actually supervised Funderburg as to any of Funderburg's job responsibilities. Thus, although Handshoe might have nominally lost her supervisory power over Funderburg, she presents no evidence that she lost anything in the way of substantive authority.

The Sixth Circuit case upon which both parties rely, *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876 (1996), is of no help to Handshoe. In that case, the court held that a transfer to another position was not an adverse employment action, where the pay, benefits, and work hours were unchanged and the material responsibilities of the employee were not "significantly diminished." The court found that the plaintiff's responsibilities were not significantly diminished where there was no loss of prestige, her duties were not materially modified, and the only thing that changed was the number of employees the plaintiff would supervise. Here, as in *Kocsis*, Handshoe's duties were not materially modified. After the merger, Lineberger had already taken over all of the substantive supervisory authority over Funderburg, including the completion of her performance reviews and supervising her day-to-day activities. Handshoe attempts to distinguish *Kocsis* by arguing that in *Kocsis* the change was only in the quantity of employees supervised, whereas here Handshoe's position was qualitatively changed from a supervisory position to a non-supervisory position. This argument might have been convincing if Handshoe had any actual supervisory power over Funderburg following the merger. But here Handshoe did not have such authority following the merger, and hence, she has

presented no evidence that her position was qualitatively changed after July 24, 1995.

## 2. Discipline

■ Handshoe's second alleged adverse action is discipline. Handshoe argues that she received counseling, documented in writing, from Lineberger. She points out that counseling documented in writing was the first step of Mercy's progressive disciplinary policy. Handshoe also points to several other "write-ups" Lineberger gave to Handshoe.

We conclude that Lineberger's discipline of Handshoe did not constitute an adverse action. The single disciplinary act upon which she relies most heavily is the same act considered in her demotion claim. The only disciplinary act that she can identify is the July 24 meeting and the following documentation of that meeting. She admitted that the other "write-ups" to which she refers were simply meetings with Lineberger at which they discussed complaints about specific points and Lineberger would take notes of what was discussed. (J.A. at 571.) These were not placed in her personnel file. As to the July 24 meeting and "write-up," it is insufficient to rise to the level of a materially adverse employment action. In *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405 (6th Cir.1999), the Sixth Circuit held that an employee's receipt of "counseling memoranda" disciplining him for specific rules infractions did not amount to materially adverse actions for purposes of the plaintiff's Title VII race discrimination claim. *See also Reid v. Madison County, Tennessee*, 1999 WL 196560, at *2 (6th Cir. Apr.1, 1999) (unpublished order) (reprimand did not constitute materially adverse action in Title VII retaliation claim where plaintiff did not suffer time off, suspension, loss of pay or benefits, or change in duties).

As Handshoe notes, some other circuits have found that, in certain circumstances, a reprimand may constitute an adverse action. *See, e.g., Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997); *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir.1996). However, in each of these cases the reprimand was issued as part of a larger pattern of retaliation for protected activity, often culminating in a more tangible action. *See Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1241 n. 3 (11th Cir.2001) (noting distinction between claims under anti-discrimination and anti-retaliation clauses of Title VII, and holding that two memos regarding inadequate performance were not adverse actions, even under *Wideman*). Here, Handshoe cannot argue that her discipline was in retaliation for protected activity, or that it was part of a pattern of retaliation. The one reprimand that she can point to (the documentation of the July 24 meeting) obviously could not have been in retaliation for her subsequent complaints about the change in reporting structure or her later decision to file an EEOC charge. Nor was it part of a pattern of "papering" her personnel file, since none of the "write-ups" were placed in her file. In any event, the Sixth Circuit has not agreed with these other circuits, even as to retaliation claims. *See Allen*, 165 F.3d at 413 (rejecting "counseling memoranda" as adverse action, even as to a retaliation claim); *see also Hollins v. Atlantic Co.*, 188 F.3d 652, 661–62 (6th Cir.1999) (requiring plaintiff to establish that employer took an adverse employment action to succeed on a retaliation claim, and holding that threat to terminate was insufficient). Hence, Handshoe's argument that she suf-

fered an adverse action in the form of discipline must fail.

### 3. Harassment

Next, Handshoe argues that she was subjected to significant on-the-job harassment. The district court did not deal with this as a separate claim. On appeal, Mercy maintains that Handshoe has never argued that she was subjected to severe and pervasive harassment.

Handshoe did mention in her complaint, as well as in her response to defendant's motion for summary judgment, that she was subjected to harassment at the hands of Funderburg and Lineberger, although it was not entirely clear that she was advancing harassment as a separate claim. (J.A. at 14, 176–77). As evidence of harassment, Handshoe points to her testimony that 1) she was berated by Lineberger in front of co-workers, 2) she was singled out to report progress on goals to Lineberger, 3) some of her duties were transferred to Funderburg, 4) she was "discredited as to work-related recommendations unless and until Lineberger heard the same thing from a normal hearing person," 5) she received inconsistent directives from Lineberger, 6) Lineberger used nasty facial expressions and body language around her, 7) Lineberger told her she should be looking for a new job, 8) Lineberger made her cry at times, and 8) Funderburg told her she should look for another job and pointed out openings in the newspaper. (Brief at 30).

■ In order to establish a claim of harassment under the ADA, a plaintiff must establish that (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harass-

ment and failed to take corrective measures. See *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997) (Title VII harassment); *Crawford v. Medina General Hosp.*, 96 F.3d 830, 834 (6th Cir.1996) (Title VII elements apply to other discrimination claims). In order to be actionable, a plaintiff must show that the alleged harassment was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000).

Handshoe's harassment claim fails for two reasons. First, the harassment she complains of is not sufficiently severe or pervasive to be actionable. To be actionable, both an objective and a subjective test must be met. "[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The court must look at the totality of the circumstances, considering the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 463 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Here, Handshoe offers only her own conclusory statements with respect to her complaints of Lineberger's berating comments, Lineberger's nasty facial expressions and body language, and incidents in which Lineberger made her cry. Handshoe's own testimony does support her contention that Lineberger treated her differently than Funderburg in

some respects. For instance, she complains that she was often "written up" by Lineberger. Yet, she admits that these write-ups were usually just Lineberger's notes of meetings with Handshoe. Because Handshoe is deaf and Lineberger did not know sign language, he often communicated to her in writing. Handshoe also complains of Lineberger's instructions to her with respect to some deaf services programs. She claims that Lineberger would sometimes tell her to stay in the office more, but at other times would tell her she should be out in the community.

In one specific incident that Handshoe recalls, the deaf services department was contacted by Cracker Barrel restaurants in connection with the opening of a new restaurant in the area. Cracker Barrel was accepting applications for employment and was inquiring about interpreters for deaf applicants. Lineberger told Cracker Barrel that interpreters could not be provided for free, and that the restaurant would have to pay for their services. Lineberger also told Handshoe that he wanted her to stay in the office at the time. The deaf applicants sought Handshoe's assistance, but she was unable to help them, and had to explain to them that the deaf services department could not send interpreters without them being paid. It is obvious from the record that Handshoe and Lineberger often had such disagreements about how the department should be run. But this does not make Handshoe's work environment objectively hostile. Even assuming her testimony to be true, as we must when considering a motion for summary judgment, the combined effect of the conduct she complains of does not rise to the level of an objectively hostile or abusive work environment.

Even assuming arguendo that Handshoe's evidence is sufficient to show that her work environment was objectively hos-

tile, there is no evidence from which a reasonable jury could conclude that the harassment was based on her disability. The only evidence Handshoe has that any of Lineberger's conduct was based on Handshoe's disability are the notes taken by Rogers. Yet, much of the conduct Handshoe complains of took place prior to the change in reporting structure. It is clear, from the record as a whole, that neither Lineberger or Funderburg got along with Handshoe. But there is no evidence that this was due to her disability. To the contrary, it appears that much of the "harassment" she complains of was actually the result of her opposition to Lineberger's management decisions. For instance, Handshoe was very frustrated by Lineberger's decision to not provide interpreters for the Cracker Barrel interviews. But his decision to not provide free interpreters was a business management decision. Handshoe provides no evidence from which a jury could infer that such decisions were actually based on her hearing impairment. A reasonable jury could not infer, simply on the basis of Rogers' notes, that the harassment Handshoe complains of was based on her disability, rather than on other potential factors—such as her performance, Lineberger's managerial style, or personal differences.

### 4. Constructive Discharge

 Handshoe's final claim is that she was constructively discharged. She contends that she faced a demotion, harassment, and threats of termination, which ultimately forced her to resign in November, 1996. In order to present a constructive discharge claim, a plaintiff must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis*, 97 F.3d at 887. The district court rejected Handshoe's constructive discharge claim, con-

cluding that Lineberger's actions were not sufficient to make her work conditions intolerable. Handshoe argues on appeal that the district court improperly considered each piece of evidence individually, rather than examining the combined effect of Lineberger's conduct.

We agree with the district court that Handshoe's constructive discharge claim must fail. The district court did discount some of Handshoe's individual complaints. For instance, Handshoe argued that her complaints about her demotion were ignored by Mercy. The district court noted that her complaints were not ignored, but simply resolved in a manner with which she disagreed. The court also noted that her last complaint letter was sent over one year before she resigned, making it unlikely that Mercy's failure to respond to her complaint caused her to resign. But the court also expressly considered the cumulative effect of all of Handshoe's evidence regarding her working condition. (J.A. at 483). The court concluded that the evidence did not raise a genuine issue of material fact as to whether a reasonable person in her position would have felt compelled to resign. Considering all of Handshoe's evidence in the record, as well as the undisputed evidence that tends to discount some of it, we agree with the district court's conclusion. Given the record as a whole, even when taken in the light most favorable to Handshoe, no reasonable jury could conclude that Handshoe's working conditions were so difficult or unpleasant that a reasonable person would feel compelled to resign.

### III. Conclusion

Because Handshoe has not presented sufficient evidence to support a finding that she suffered a materially adverse em-

ployment action, we affirm the judgment of the district court.