NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0008n.06

No. 15-4292

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 05, 2017
DEBORAH S. HUNT, Clerk

JAMIE MANGUM,

    Plaintiff-Appellant,

v.

GARY REPP; JASON WISE; and RAY BOWMAN,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

BEFORE: GUY, BOGGS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In 2007, Darrel Saxon sexually assaulted plaintiff Jamie Mangum at the Marion Juvenile Corrections Facility. Mangum brought a claim under 42 U.S.C. § 1983 against seven Marion staff members in their individual capacities, alleging deliberate indifference to his safety needs in violation of the Eighth Amendment. Mangum dismissed four defendants and proceeded against Jason Wise, Gary Repp, and Ray Bowman, who moved for summary judgment. Defendants asserted the defense of qualified immunity in their answer, but did not seek summary judgment on that basis. The district court granted defendants' motion and dismissed plaintiff's case. Finding no reversible error, we affirm.

I.

On January 17, 2007, twelve-year-old Jamie Mangum was committed to the Ohio Department of Youth Services ("DYS") for felonious assault. He stood 4 feet 6 inches tall and weighed approximately 96 pounds. During his initial assessment, plaintiff disclosed that an older teen had sexually abused him in the past. Considered a "high-risk/need offender," plaintiff was transferred to the intensive mental health unit (the "unit"), or Unit 4B, at the Marion Juvenile Correctional Facility.

This was the only such unit in DYS, and it could only house up to 12 juveniles. The unit was semi-octagonal in shape and accessible only via a hallway that led to the officers' podium facing out into the unit. Off that hallway were the TV room, mop closet with cleaning supplies, and staff offices. There were two bathrooms, one to the left and one to the right of the podium. The unit bathrooms and closets were to be kept locked at all times, to be opened only by a corrections officer or other facility staff. Each youth had his own room with a door that locked behind him.

Eighteen-year-old Darrel Saxon was on the unit with Mangum. Saxon was committed to DYS in 2003 for rape and gross sexual imposition. His victims included three children between the ages of six and eight. While in DYS custody, Saxon was disciplined for sexual misconduct. In April 2006, Saxon was transferred to the unit to address "severe self-injurious behavior." There, Mangum and Saxon had some interaction, including playing cards, and cleaning the unit together.

Defendant Jason Wise, a psychology assistant, treated Saxon and Mangum while they were on the unit. Wise was responsible for clinical tasks such as treatment planning and risk assessment. Wise, overseen by Psychology Supervisor Jane Welch, helped complete Saxon's

and Mangum's intake assessments and met with each of them at least once a week. Wise knew that Saxon was a sex offender. Wise also knew that Mangum had a history of sexual victimization.

When Mangum arrived, Welch put him on a safety plan. Welch recommended that the unit's correctional officers "be within arm's reach" of Mangum and "[b]e aware of the location of [Mangum] at all times on the unit" to "prevent harm to [Mangum]." Welch also assigned Mangum an initial precautionary status of "watch," requiring constant one-on-one monitoring by a staff member.

A youth on the unit could be assigned one of three precautionary statuses: "watch," "observation," or "behavioral." Watch was the most intensive and invasive status; it was reserved for suicidal youth, and assigned to prevent self-injurious behaviors. Observation status was a step down from watch, usually requiring safety checks every ten to fifteen minutes. Behavioral status was least restrictive: safety checks were still required, but no particular staff member was responsible for monitoring the youth. As a youth's behavior improved, Wise and Welch tried to step him down in precautionary status.

A psychologist determined the precautionary status level and behavioral guidelines for each youth on the unit, communicated it to Operations via a written precautionary status notice and plan, and Operations would then disseminate the notice and plan to staff for implementation. While a precautionary status plan was usually drafted to prevent self-injurious behavior, it could include additional guidelines for staff that were unique to a certain youth, such as a safety plan or steps staff should take if a youth were to fight with others.

Mangum was assigned to Wise's caseload, and Wise continued Welch's safety plan. Wise, in collaboration with Welch, reviewed and updated Mangum's precautionary status and

plan frequently as part of his treatment. Wise renewed plaintiff's watch status on February 9, 2007, and February 13, adding new "safety precautions" to the guidelines—such as having Mangum always sit nearest a staff member while in the cafeteria, the unit, or a classroom, be within arm's length of an officer while moving in line, and ask to use the restroom "[i]n order to know [Mangum's] location at all times."

The next day, Welch changed Mangum's precautionary status from watch to observation, requiring safety checks every fifteen minutes rather than one-on-one monitoring, but with the same safety plan. On February 15, Wise changed Mangum's status from observation to behavioral, and included lengthy behavioral guidelines in the precautionary status plan. Wise required staff to check on Mangum every ten to fifteen minutes, and kept Mangum on the safety plan "to prevent other youth from harming him." In addition to the existing seating, line movement, and restroom use restrictions, Wise also required Mangum to "inform staff if he is threatened by others." Plaintiff remained on this safety plan for at least another four weeks.

While Mangum was on the unit, Saxon was almost always assigned some degree of precautionary status and additional monitoring as well. For example, Saxon was on suicide watch with one-to-one staff monitoring on February 16, 20-23, and 28, and March 13-14. He was on behavioral status on February 15, and March 1, 2, 6, 8 and 10. On February 27, Saxon was on observation status.

On March 1, Wise met with Mangum to discuss "rumors that other youth have been approaching [Mangum] for oral sex." Mangum admitted that "a certain youth approaches him for oral sex, while another youth periodically grabs his buttocks," and identified Saxon as the "certain youth." Although plaintiff "denied engaging in sexual activity," he did not feel safe, so Wise and Mangum talked about "ways to maintain safety."

Wise wrote a clinical contact note that same day documenting his conversation with Mangum. Clinical contact notes were same-day documentation of what a psychologist had discussed with a youth during a session; afterward, the clinician created a note in a database, and then printed and signed it before giving it to the department secretary to file in the youth's psychology file. In the March 1 note, Wise states he notified Officer Spears and Operations Manager Gilchrist of Mangum's allegations and refers to completing an incident statement.

Wise wrote incident statements to notify Operations of threats against Mangum or other youth. Operations oversaw day-to-day unit security. Incident statements were hand-delivered to Operations staff, who would decide if or how to respond. In some cases, Operations generated an incident report for the superintendent, but not always. Wise documents in the corresponding March 1 incident statement that he informed Officer Spears of what Mangum reported that day regarding Saxon. Wise recalls hand-delivering the incident statement to Gilchrist in Operations.

On March 8, Mangum told Wise that Saxon had threatened to rape him in the bathroom. In response, Wise completed another incident statement and a risk assessment update that same day. A risk assessment update could substitute for a clinical contact note, and documented the youth's mood, relationships with others, and his general adjustment. Wise and Welch both signed the March 8 risk assessment update in which Wise notes Mangum reported feeling unsafe because "[a]nother youth allegedly threatened to rape" him, but had "denied any inappropriate sexual contact." Also on March 8, Wise issued an updated precautionary status notice for Mangum that kept him on the same safety plan. Finally, Wise and Welch renewed their recommendation that Saxon be transferred off the unit to complete sex offender programming.

Like Wise, defendants Gary Repp and Ray Bowman also worked at Marion while Mangum and Saxon were housed there together. Repp was a juvenile corrections officer

assigned to the unit. He had "a pretty good working relationship with all the youth" in the unit. Repp knew that Saxon was a sex offender. He also knew that Mangum was "very young" and "very small in stature." Repp, however, was unaware of anyone being sexually targeted on the unit or that Saxon was approaching anyone for sex.

Bowman was a unit manager once in charge of Unit 4B, although it is unclear when. In general, the unit manager was an administrator who "deal[t] with the day-to-day issues on a unit" like keeping the youth on schedule, maintaining the unit, and implementing treatment plans. On March 11, Bowman became involved in an altercation between Saxon and Mangum. After Saxon suddenly ran towards Mangum "in a threatening manner," Saxon was placed in isolation. Bowman was the administrator on call. Saxon later stated in an interview with David Haynes, an inspector for DYS, that Bowman came to see him "a couple of hours" later. According to Saxon, Mangum told Bowman that Saxon had been asking him for sex, and in response Bowman warned Saxon that if he went near Mangum, Bowman would have him "charged as an adult and bound over." Saxon also told Harvey Culbreth, another youth in the unit, about this confrontation.

Haynes noted in his 2007 investigation report that Bowman remembered a "similar conversation" with Saxon, but neither Saxon nor Mangum had told Bowman that "there was any inappropriate contact taking place." Plaintiff recalls telling Bowman sometime in March 2007 that Saxon was sexually targeting him and he felt unsafe, but did not tell Bowman at that time that he had been assaulted. As for Bowman, when he was deposed in 2015, he did not recall any exchange with Saxon or Haynes, and did not recall Mangum at all.

Two days after the fight, on March 13, Saxon told Wise that Mangum had agreed to give him "lifetime blow jobs" as payment for outstanding gambling debts. Wise wrote in his clinical

contact note that Saxon was considering the offer "because he has been incarcerated for a long time" but "remained ambivalent about his intent." Wise also completed an incident statement that day reporting to Operations what Saxon had said. Wise then issued an updated precautionary status plan for Mangum on March 16 that kept the same safety plan.

On March 20, Mangum first reported that Saxon had sexually assaulted him. At approximately 10:00 a.m., Repp overheard a youth ask Saxon whether Mangum had performed oral sex on Saxon for snacks. Saxon replied that it was true, and Repp immediately reported the incident. That afternoon, Mangum told Wise that he had performed oral sex on Saxon "multiple times, with the last time occurring a 'few' days ago." Wise completed an incident statement, writing "cc. J Welch" in the lower left-hand corner. Gilchrist in Operations then generated an incident report notifying the administrator on call and the Ohio State Highway Patrol. Saxon was moved off the unit.

Per DYS standard operating procedures, defendants were required to notify Operations if they received a report of sexual assault or possible sexual assault. Defendants also had to communicate with Operations if they became aware that a youth was in danger of being harmed by someone else. A written report was not required. No defendant had the authority to move a youth on or off the unit (only psychology supervisors, the Clinical Services Director, or the Program Deputy could move a youth on or off the unit).

In 2007, a jury convicted Saxon of sexually assaulting plaintiff in the unit's mop closet. At trial, Mangum testified that he told Wise about the assaults one to three weeks after the last assault occurred. Mangum has never remembered the date of any assault. Another youth, Damian Cash, testified that he had witnessed an incident in the mop closet during unit cleaning and had told Repp that "Darrel and Jamie Mangum's doing something in the utility closet."

Cash said this happened "during Christmas or something like that." Repp does not recall this incident.

Mangum sued Wise, Repp, and Bowman in their individual capacities under 42 U.S.C. § 1983 for violating his Eighth Amendment rights by failing to protect him from Saxon. Defendants moved for summary judgment, and plaintiff opposed. The district court granted defendants' motion and dismissed plaintiff's case. Mangum appeals.

## II.

We review a district court's grant of summary judgment de novo. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering whether to grant summary judgment, all reasonable inferences must be made in favor of the non-moving party. *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We do not make credibility judgments or weigh the evidence. *Moran*, 788 F.3d at 204.

## A.

As a threshold matter, both parties raise evidentiary objections. Defendants argue that trial testimony from Saxon's 2007 criminal trial, and Saxon's, Culbreth's, Bowman's, and Haynes' statements taken from Haynes' 2007 investigation report should be disregarded as hearsay. Plaintiff questions the authenticity of Welch's signature on the March 8 risk assessment

and notes the document itself has not been verified as a true and accurate copy of the original. These objections fail for two reasons.

First, the parties did not raise these objections in district court. Although defendants filed a motion to strike below, it pertained to deposition certifications. For his part, plaintiff merely observed in his response brief to defendants' dispositive motion that the March 8 risk assessment was unauthenticated. The district court relied on this evidence without question. It is well established that "[i]f a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and we will review such objections only to avoid a gross miscarriage of justice." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citation omitted).

Second, it would not be a gross miscarriage of justice to decline to address the merits of the parties' objections. As amended in 2010, Federal Rule of Civil Procedure 56 provides that parties asserting a genuinely disputed fact need only "cit[e] to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). It then permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Once an objection is properly made, the proponent must "show that the material is admissible as presented or . . . explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment.

Defendants do not object that plaintiff's evidence "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Even if they had, plaintiff's evidence taken from the trial transcripts would be admissible as direct trial testimony. The same is true for the statements in Haynes' report.

Regarding the March 8 risk assessment, Rule 56 no longer draws a clear distinction between authenticated and unauthenticated evidence for purposes of summary judgment. The "requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration" has been "omitted as unnecessary." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment; *see also Ganesh v. United States*, 658 F. App'x 217, at *2 (6th Cir. 2016) (deeming waived plaintiffs' objection to "unverified and unsworn" documents). Accordingly, the district court did not err in considering plaintiff's or defendants' evidence, and we will consider the same.

B.

Plaintiff claims Wise, Repp, and Bowman were deliberately indifferent to his safety needs despite their awareness that, as a small twelve-year-old susceptible to sexual abuse, plaintiff was particularly vulnerable to attack by Saxon in the intensive mental health unit setting. The Supreme Court has established that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. A prison official violates an inmate's rights only if the official is "deliberate[ly] indifferen[t] to inmate health or safety." *Id.* (internal quotation marks omitted).

"Deliberate indifference is a stringent standard of fault." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks, brackets, and citation omitted). To establish deliberate indifference, Mangum must satisfy an objective and subjective component. *Farmer*, 511 U.S. at 834. Under the objective component, Mangum must show that he was exposed to a "substantial risk of serious harm" to his safety. *Id.* The subjective component requires Mangum

to show that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]"; (2) actually drew the inference; and (3) consciously disregarded the risk. *See id.* at 837, 839. Plaintiff may satisfy the subjective component through ordinary methods of proof, "including inference from circumstantial evidence[.]" *Id.* at 842.

1.

Defendants do not dispute the objective component of plaintiff's Eighth Amendment claim, and there is little question plaintiff has satisfied it. Indeed, all Mangum must show is that he was "incarcerated under conditions posing a substantial risk of serious harm." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). The district court ruled Mangum established via DYS and Highway Patrol records, as well as Saxon's conviction, that incarcerating him in a small unit with a convicted sex offender exposed Mangum to such a risk. We agree that Mangum has satisfied the objective component.

2.

The subjective component is the focus of this dispute. We ask whether Mangum has presented facts that, if true, show how defendants (1) subjectively perceived facts from which to infer a substantial risk of serious harm to plaintiff, (2) actually drew the inference that there was a substantial risk, and (3) disregarded that risk. *Farmer*, 511 U.S. at 837, 839. We address each defendant individually. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

*Jason Wise.* The district court properly granted summary judgment in favor of Wise. There is little doubt Wise was subjectively aware of the substantial risk of serious harm that Saxon posed to Mangum. As Saxon's and Mangum's treating psychologist, Wise had direct

knowledge of their personal characteristics and vulnerabilities. *See Taylor v. Mich. Dep't of Corrections*, 69 F.3d 76, 82 (6th Cir. 1995) ("[T]he jury could find that [defendant] had direct knowledge of plaintiff's characteristics because he personally reviewed [plaintiff's] file. . . ."). Wise knew Saxon's history as a sex offender, and that Saxon had not completed sex offender treatment. He also knew that Mangum was young and had a history of sexual victimization.

Wise also knew that Saxon had threatened Mangum. On March 1, Mangum told Wise that Saxon was approaching him for sex and he did not feel safe. A few days later, Mangum told Wise that Saxon had threatened to rape him in the bathroom. Saxon himself told Wise on March 13 that he was thinking about accepting "lifetime blow jobs" from Mangum as payment for outstanding gambling debts. Wise documented these threats in his clinical records and reported them to Operations. He also recommended that Saxon be transferred off the unit so he could resume sex offender programming. A reasonable juror could infer from Wise's personal knowledge of Saxon's and Mangum's clinical histories and their interactions while on the unit that Wise was subjectively aware Saxon posed a substantial risk of harm to Mangum. Wise does not argue otherwise.

A reasonable juror could not infer, however, that Wise disregarded the risk. Wise "may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him." *Bishop v. Hackle*, 636 F.3d 757, 767 (6th Cir. 2011) (citation omitted). But if Wise responded reasonably to the risk, he "may be found free from liability . . . even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Even when viewed in the light most favorable to Mangum, the record shows Wise took reasonable steps in response to the risk Saxon posed. First, Mangum was always on a safety

plan, even as Wise and Welch changed his precautionary status and other behavioral guidelines in response to Mangum's own conduct. When he arrived on the unit, Welch put Mangum on a safety plan and assigned him suicide watch status, requiring one-on-one staff monitoring. Wise continued that plan, maintaining Mangum's watch status through mid-February.

On February 13, Wise added new safety precautions to Mangum's behavioral guidelines "[i]n order to know [Mangum's] location at all times," including always having staff within arm's length of Mangum during line movement, always seating Mangum nearest an officer or teacher, and requiring Mangum to ask for permission to use the restroom. On February 15, Wise added the requirement that Mangum tell staff when he felt threatened by others. Wise implemented this safety plan to prevent sexual victimization and address "vulnerable" areas, and Mangum remained on this plan for at least the next four weeks. Wise did not know that Saxon had assaulted Mangum until March 20, and plaintiff points to no evidence indicating that Wise knew before that date that his safety plan was failing to prevent sexual contact or that staff was not following it.[1]

Welch reduced Mangum's precautionary status from watch to observation, and thus eliminated one-on-one staff monitoring, on February 14. Wise did not restore Mangum to watch status, but thereafter required staff to conduct safety checks every ten to fifteen minutes. Plaintiff argues that Wise should have maintained consistent one-on-one monitoring of Mangum

---

[1]Plaintiff argues the unit lacked leadership, had no safety plan for youth at risk of sexual victimization, was plagued by turnover, and that staff was "under investigation for not following safety plans." These allegations, however, are based on a May 4, 2007, report by Mental Health Coordinator Mike Gordon. Gordon visited the unit after the assault and does not attribute these concerns to Wise. Wise testified at his deposition that Mangum's "safety plan was being followed and the safety plan was very thorough." Plaintiff testified at his deposition that he did not know he was ever on a safety plan, let alone whether it was followed or not. Plaintiff has thus not created a triable dispute of fact regarding what Wise knew about the effective implementation of Mangum's safety plan while the assaults were occurring.

and Saxon for safety reasons. Watch status, however, was a suicide-prevention tool. Wise's uncontroverted deposition testimony is that Mangum was taken off "suicide watch" because "from a self-injury standpoint . . . he didn't need to be on suicide watch." Mangum's safety plan was in place to keep *others* from harming him.

Second, Wise documented and reported what he knew. On March 1, Wise completed a clinical contact note and an incident statement documenting Mangum's admission that Saxon was approaching him for sex. Wise wrote in his note that he notified Officer Spears and Operations Manager Gilchrist. When Mangum reported on March 8 that Saxon threated to rape him in the bathroom, Wise authored another incident statement and a risk assessment update that Welch signed. He also submitted a request to transfer Saxon off the unit. Wise again completed an incident statement on March 13, reporting what Saxon had disclosed regarding Mangum's offer of "lifetime blow jobs." Finally, Wise submitted an incident statement on March 20 reporting that Mangum had disclosed multiple assaults at the hands of Saxon. By reporting this information to Operations and his supervisor, and trying to transfer Saxon, Wise exercised the limit of his authority as a psychology assistant.

Plaintiff argues that there is no evidence corroborating Wise's claim that he notified others before March 20 about the threats plaintiff was reporting. Plaintiff, however, has not produced any affirmative evidence refuting Wise's recollection of reporting these events. Plaintiff would bear the burden at trial of proving deliberate indifference, and as the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 257. Yet plaintiff did not depose anyone Wise claims he reported to, and does not point to any place in the record where someone questions whether or when Wise submitted a specific document. Instead, plaintiff relies almost

exclusively on Assistant Superintendent Tracey Cornelli's testimony at Saxon's criminal trial to show that a triable dispute of material fact exists.

Cornelli testified that, in the administrative records she had with her at trial, she found no record of any incident involving Mangum and Saxon being reported on March 8. Cornelli's testimony, however, does not create a genuine dispute of material fact with respect to whether *Wise* wrote and submitted an incident statement to someone in Operations on March 8 because it only speaks to whether *Operations* logged an incident in its database that day. Even if this "scintilla" of evidence is sufficient to raise a question of fact as to whether Wise submitted an incident statement to Operations on March 8 reporting that Saxon had threatened to rape Mangum in the bathroom, there is no question he notified his supervisor Welch that day via the updated risk assessment. *See* R. 43-1, ID 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a properly supported motion for summary judgment]."). Plaintiff's argument that no incidents involving Mangum or Saxon appear in the March 1, 8, and 13 shift reports is unpersuasive for the same reason.

In short, plaintiff fails to create a triable issue. We focus on Wise's response, not on that of his superiors. Alleging a lack of independent verification that Wise submitted certain documents on specific dates does not create a genuine dispute of material fact regarding what Wise testified he did do and the content of the documentary evidence he submitted in support of his assertion.

Plaintiff argues that Wise should have done more. Our inquiry, however, is not focused on what Wise could have done differently, but whether his response was *reasonable*. *See Farmer*, 511 U.S. at 844 ("[P]rison officials . . . may be found free from liability if *they responded reasonably* to the risk. . . ." (emphasis added)). Indeed, his duty under the Eighth

Amendment was only to insure "reasonable safety." *Id.* at 844. When viewed in the light most favorable to Mangum, a reasonable juror could find that Wise perceived facts from which he inferred a substantial risk of harm to plaintiff, but not that he disregarded that risk. Plaintiff's argument to the contrary sounds in negligence, not deliberate indifference. *See Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) ("Deliberate indifference is characterized by obduracy or wantonness–it cannot be predicated on negligence, inadvertence, or good faith error.").

*Gary Repp.* The district court also properly granted summary judgment in favor of Repp. Mangum's claim against Repp rests almost exclusively on Cash's trial testimony. Resolving all factual disputes in Mangum's favor, the facts indicate Repp knew Saxon was a sex offender, and Mangum was "very young" and "very small in stature." At some point before March 20, Repp was on duty with at least one other officer when Saxon assaulted Mangum in the mop closet during unit cleaning.[2] After witnessing the incident, Cash told Repp that "Darrel and Jamie Mangum's doing something in the utility closet." Repp knew his charges were not supposed to be in the mop closet unattended, although those on cleaning duty could, with staff permission and supervision, retrieve supplies.

Mangum argues a reasonable jury could infer that Repp disregarded an obvious threat to Mangum's safety when he did not check the mop closet in response to Cash's statement. On these facts, however, Mangum has not established a triable issue with respect to Repp's subjective awareness that a substantial risk to Mangum's safety existed. In *Bishop v. Hackel*, we found a dispute of material fact where a victim of sexual assault had presented evidence that a

---

[2]Although the date of this assault has never been conclusively established, it must have occurred prior to March 20, the day Mangum first reported that Saxon had assaulted him. Saxon and Mangum were separated from that day forward.

prison guard, who had had substantial interaction with the victim and the perpetrator, was aware of the victim's status as a vulnerable inmate and "aware that prisoners with [the victim's] characteristics are vulnerable to attack." 636 F.3d at 771. In that case, the defendant testified that he knew "there had been many sexual predators" in the mental health unit and "other inmates complained about sexual pressure." *Id.*

Mangum points to no such evidence as it relates to Repp. Even assuming Repp had "substantial interaction" with Saxon and Mangum, Mangum does not argue Repp knew that he, or an inmate with his characteristics, was vulnerable to sexual assault. Nor that Repp was privy to, or even aware of, anything in Wise's clinical file on either youth other than Saxon's sex offender status. Repp's uncontroverted deposition testimony is that he was not aware before March 20 of "any specific situations . . . where there was somebody being sexually targeted" on the unit, that Saxon was approaching anyone for sex, or that there were rumors to that effect. When he finally became aware on March 20 of possible sexual contact between Saxon and Mangum, he immediately reported it. Repp asserts that this was the "only time" he knew "of anything directly sexual that had taken place between any youth, including [Saxon and Mangum]."

Mangum cites no facts from which a reasonable jury could infer otherwise. While Repp cannot "escape liability" by "merely refus[ing] to verify underlying facts that he strongly suspected to be true," *Farmer*, 511 U.S. at 843 n.8, an official who is *actually unaware* of a substantial risk to an inmate cannot be held liable merely because the risk was obvious "and a reasonable prison official would have noticed it." *Id.* at 841–42. It is thus not enough to show that a reasonable person would have known of the risk, or even that Repp in particular should have known. *See id.* at 843 n.8. As the Supreme Court has explained, a trier of fact can find

actual knowledge of risk where "circumstances suggest that" a defendant was exposed to "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and thus the defendant "must have known about it." *Id.* at 842–43 (citation omitted). The evidence against Repp, however, cannot fairly be characterized as similar to this example.

To successfully establish deliberate indifference, Mangum must show not only that Repp was "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to plaintiff] exists," but also that he *actually drew the inference*, not just that he should have done so. *See id.* at 837 (the official "must also draw the inference"). The only evidence Mangum cites suggesting that Repp drew such an inference is Cash's vague statement to Repp that Saxon and Mangum were "doing something" in the mop closet during the unit clean up.

At most, Repp was on notice that two of his charges were in the mop closet, probably unattended, and he was arguably negligent in not investigating this potential policy violation. Deliberate indifference, however, requires the *reckless disregard* of a substantial risk of serious harm; mere negligence is insufficient. *See Farmer*, 511 U.S. at 835–36. Accordingly, "[Repp's] failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. Given the lack of evidence that Repp knew at the time the statement was made that Mangum was vulnerable to attack, or that any sexual targeting had ever occurred on the unit, Cash's statement alone is not enough to create a triable issue of fact as to Repp's subjective awareness of a *substantial* risk of *serious* harm facing Mangum.

*Ray Bowman.* Turning to Mangum's claim against Bowman, the district court properly granted summary judgment in his favor. Mangum claims he told Bowman that Saxon was

pursuing him for sex, but Bowman disregarded the risk by confronting Saxon without also reporting what Mangum had said. Resolving all factual disputes in Mangum's favor, the facts show that Mangum and Saxon had a fight on March 11, and Saxon was placed in isolation. Bowman, the administrator on call that day, was notified.

When Bowman asked him about the altercation, Mangum said Saxon was targeting him for sex and he felt unsafe, but did not reveal at that time that Saxon had assaulted him. In response, Bowman advised Mangum to stay away from Saxon and encouraged Mangum to tell him if the problem persisted. Bowman then confronted Saxon, warning him that if he went near Mangum, Bowman would have him charged as an adult. Saxon did not admit to any sexual contact.

Plaintiff argues that Bowman, like Wise, should have done more. But again the question is whether Bowman's response was reasonable, not what Bowman should have done differently. *See Farmer*, 511 U.S. at 844. In *Bishop v. Hackle*, a nineteen-year-old inmate was sexually assaulted by a forty-four-year-old charged with multiple counts of criminal sexual conduct while both were housed in a small mental health unit. 636 F.3d at 762. The victim filed an Eighth Amendment claim against several deputies, arguing that the deputies "were aware that due to his personal characteristics, [plaintiff] was vulnerable in a jail setting, and particularly vulnerable to attack by [defendant]." *Id.* at 767. To succeed on his claim, this court cautioned the plaintiff that he "must prove that each Deputy had enough personal contact with him to be subjectively aware of his vulnerability to attacks or the abuse that he alleges he was suffering." *Id.* at 768.

Here, plaintiff alleges only one opportunity for Bowman to perceive and assess the seriousness of the situation between plaintiff and Saxon. Mangum claims no personal relationship with Bowman, who was "just a unit manager," and says he did not go to Bowman's

office with any frequency. Moreover, there is no evidence Bowman was aware of Saxon's status as a sex offender beyond what Mangum told him, or that he perceived Mangum to be young, small, or otherwise vulnerable. Thus, Mangum has not established that he had enough contact with Bowman to allow Bowman to perceive Mangum's status as a vulnerable inmate. *See id.* at 770 (finding no triable issue of fact where defendant lacked sufficient contact with victim to "perceive his asserted status as a vulnerable inmate").

Plaintiff argues on appeal that Bowman should have reported what Mangum told him about Saxon. Although DYS standard operating procedures require staff who "become aware that a youth is in danger of injury by others" to report that information to Operations, these procedures do not define the contours of the Eighth Amendment and a failure to follow them does not in itself constitute deliberate indifference. *See Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 407 (6th Cir. 2015). Bowman acted on his concern for Mangum by encouraging Mangum to keep him informed and by confronting Saxon, warning him to stay away from Mangum, and threatening to have Saxon tried as an adult should any sexual contact occur. Like Wise and Repp, Bowman could not move either youth off the unit. Given his limited contact with, and personal knowledge of, Saxon and Mangum, and the fact that neither youth told him there had been any sexual contact, no reasonable juror could infer that Bowman callously disregarded a known risk to Mangum's safety. The district court thus properly granted summary judgment in favor of Bowman, as well as Wise and Repp.

III.

Finding no reversible error, we affirm.

BOGGS, Circuit Judge, concurring in part and dissenting in part. I concur with the majority's opinion with respect to defendants Wise and Bowman. However, with respect to defendant Repp, I believe that our case law indicates that Mangum has shown sufficient facts to permit a reasonable jury to find that Repp was subjectively aware of the substantial risk Saxon posed to Mangum in the juvenile-corrections unit. Thus, I would reverse the district court's grant of summary judgment as to Repp.

The majority relies upon an erroneous interpretation of our decision in *Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011), where we held that summary judgment was *not* appropriate in an analogous prisoner sexual-assault case. The majority attempts to distinguish *Bishop*, noting that the defendant in that case, in addition to regularly interacting with the prisoners in question, also testified that he knew that there had been many sexual predators on the unit and that other inmates had complained about sexual pressure. Proposed Op. at 18–19. As Repp was not similarly aware of such widespread problems in the juvenile-corrections unit in this case, the majority concludes that a reasonable jury could not find him to be subjectively aware of the specific threat Saxon posed to Mangum.

But those observations in *Bishop* are plainly dicta. The court in that case had *already* concluded that a reasonable jury could find that the defendant was subjectively aware of the risk that the particular prisoner posed to the plaintiff "because of [Plaintiff's] status as a vulnerable inmate and [Perpetrator's] status as a predatory inmate." *Bishop*, 636 F.3d at 771. The facts that the *Bishop* court used to reach that conclusion are remarkably similar to the facts of the instant case: "(1) [Perpetrator] was four inches taller than [Plaintiff]; (2) [Perpetrator] was charged with various sex-based offenses; (3) [Plaintiff] was young, had a history of mental illness, appeared to be confused during his intake evaluation, and was thought to be mentally 'slow.'" *Id.* at 767. As

the majority notes in its opinion, "the facts indicate Repp knew Saxon was a sex offender, and Mangum was very young and very small in stature." Proposed Op. at 18 (internal quotations omitted). Even more important, the facts alleged also indicate that another juvenile in the unit explicitly told Repp that Mangum and Saxon were "doing something in the utility closet." *Ibid*. And this was at a time that Repp was on duty at the unit podium, only a few steps from the utility closet, and yet he allegedly did nothing. [*See* R.58 at ID#1811, R.57 at ID#1565–67]. Repp denies having had such notice, but the juvenile's statements, in sworn testimony at Saxon's criminal trial, are more than sufficient to create a genuine issue of material fact on this point.

Although it is true that "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known" that a prisoner was at risk to find Eighth Amendment liability, *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994), it is also true that "a factfinder may conclude that a prison official knew of a substantial risk *from the very fact that the risk was obvious*." *Id.* at 842 (emphasis added). The specific information allegedly conveyed to Repp at the very time and place that he could have intervened adds to the ability of a reasonable jury to find that the risk was indeed perceived and then disregarded. Therefore, I respectfully dissent.