Judith E. Levy, United States District Judge
On January 5, 2014, plaintiff Mark McCracken was raped in his prison cell. He brings this suit against various prison *942 officials, alleging they violated his Eighth Amendment right to be free from cruel and unusual punishment when they were deliberately indifferent to the threat posed by plaintiff's cellmate. This case is before the Court on defendants' motion for summary judgment. For the following reasons, the motion is granted in part and denied in part.
I. Background
Plaintiff, a former prisoner at the Cotton Correctional Facility ("JCF") in Jackson, Michigan, brings this action against eight officials at that prison. They are Warden Randall Haas, Deputy Warden Cascelia Brown-Brandon, Resident Unit Manager ("RUM") Victoria McCabe, Assistant Resident Unit Supervisor ("ARUS") Hilary Madery, ARUS LaTanya Phillips, Corrections Officer ("CO") Ernest Swain, CO Douglas Warner, and CO Shawn Warren.
A. Plaintiff's Experience at JCF
Plaintiff entered state custody on March 5, 2013, and was transferred to JCF on April 10, 2013. (Dkt. 54 at 6.) On December 7, 2013, plaintiff requested a transfer into protective custody because he was "being pressed for money and [ ] didn't get along with a certain individual" whose foot he ran over with his wheelchair. (Dkt. 58-1 at 4.) McCracken would later learn that the "certain individual" was Jason Rueckert, the inmate who eventually raped him on January 5, 2014.
After being transferred to another facility and transferred back to JCF shortly thereafter, plaintiff was housed in protective custody, sharing a cell with Rueckert. At the time, plaintiff was twenty-two years old and weighed 130 pounds. (Dkt. 58-2.) His lower left leg was amputated, and he frequently used a wheelchair to get around. (Id. ) Rueckert, by contrast, was twenty-seven years old and weighed 234 pounds. (Dkt. 60-1.) He was incarcerated for committing sexual violence against multiple children. (Dkt. 60-2.) When plaintiff realized that Rueckert was the "certain individual" who gave him trouble while in the general population, he attempted to warn prison officials that he felt in fear of harm from sharing a cell with Rueckert.
First, plaintiff attempted to warn the COs on duty, telling COs Doug Warner and Ernest Swain "several times" that he was in fear of harm from Rueckert. (Id. at 17-18.) He did not warn CO Shawn Warren in the same manner, but he did tell Warren that he and Rueckert were not getting along. (Id. at 18-19.) According to plaintiff, the officers responded with various deferrals, but neither Swain nor Warner were able to recall these interactions with plaintiff. (Dkt. 59-3 at 13-14; Dkt. 59-4 at 15-16.) Warren, by contrast, remembered both plaintiff and Rueckert, and testified that plaintiff and Rueckert "acted like brothers inside the cell." (Dkt. 59-5 at 17.) Warren's testimony is corroborated by the statement he gave to the official who investigated plaintiff's official grievance. (Dkt. 58-1 at 21-22.)
Next, on January 2, 2014, plaintiff sent two "kites" to prison officials warning them of the danger.[1] (Id. at 9-11.) He addressed one to the "Warden's Office," but it is not clear if he meant for it to go to Warden Randall Haas or Deputy Warden Cascelia Brown-Brandon. (Id. ) The other was addressed to his RUM, Hilary Madery. (Id. ) The kite said, in relevant part, "C/Os [sic] Warner has placed prisoner Rueckert in my cell and told me to work out our problems. This is one of the inmates I was having problems with on the yard. Please move me before there is an *943 issue." (Dkt. 72-1; see also Dkt. 58-1 at 9 (plaintiff reading the kite aloud at deposition).) Plaintiff did not receive a response to the kite addressed to the Warden's Office, but did receive a response from Madery. (Id. ) Madery's response informed plaintiff that he was on a list to be transferred to another prison. (Id. ) Though Madery did not recall receiving this specific kite, she testified that it was her regular practice to read and respond to all of the kites she received from prisoners. (Dkt. 59-2 at 13.)
Plaintiff then filed a grievance through the prison's official grievance channel. (Dkt. 58-1 at 20-24.) The grievance was dated January 3, 2014-three days before Rueckert attacked plaintiff-but is marked as received on January 10, 2014. (Id. at 23.) In the grievance, plaintiff mentioned the kite he allegedly sent to the warden, but not the one he sent to Madery. (Id. at 22.) He also described conversations about Rueckert with Warner and Warren, but not with Swain. (Id. )
During this period, Rueckert's request for protection that landed him in the same cell as plaintiff came up for a standard security classification committee ("SCC") review. (Dkt. 62-4 at 11; see also Dkt. 58-3 at 8-9.) The SCC, made up of a deputy warden and a RUM, reviewed prisoner requests for transfer or protection to ensure their validity. (Dkt. 58-3 at 8-9.) The SCC members had the prisoner's "counselor file" during the review, which contains all of the paperwork generated about a specific prisoner, and they used it in their evaluation. (Dkt. 62-4 at 6; see also Dkt. 76-3.)
In November, 2013, the SCC, staffed by RUM McCabe and Brown-Brandon, rejected Rueckert's previous request for protection because they believed he was trying to manipulate them into a more private cell assignment. (Dkt. 62-4 at 3-4.) The same SCC convened for Rueckert on December 27, 2013, and they recommended that he be transferred to a different facility. (Id. at 11-12.) The committee decided that Rueckert should not be moved from his current placement in plaintiff's cell while he awaited transfer. (Id. )
Having obtained no relief as a result of his complaints, plaintiff remained in a cell with Rueckert, and Rueckert raped him on January 5, 2014.
B. The Prison Rape Elimination Act
The Prison Rape Elimination Act ("PREA") required, as of August 2013, that all prisoners be assessed for their potential to be a sexual assault victim or aggressor. See 42 U.S.C. § 15601, et seq. All prisoners in the Michigan Department of Corrections ("MDOC") were assessed for their PREA status at that time. (Dkt. 63-6 at 18.) The assessment, usually conducted by an ARUS, required the assessor to evaluate the prisoner on two separate scales: one for aggressor tendencies and one for victim tendencies. (See, e.g. Dkt. 69-7 at 8-11; Dkt. 56-2.) A PREA assessment would return a score of victim, potential victim, no score, potential aggressor, or aggressor. (Dkt. 66-2 at 2.) The scores were used to determine inmate housing assignments; in MDOC facilities, inmates could only be housed with other inmates who had compatible PREA scores. (Dkt. 65-2 at 5.) For example, someone whose score was victim could only be housed with someone whose score was victim, potential victim, or no score. (Id. ) Such a person could not be housed with anyone on the aggressor scale, and there was a program written into the applicable MDOC prisoner database that would block incompatible matches. (Id. )
Every so often, a PREA assessment would return an internally incompatible score, identifying someone as both victim and aggressor. (Dkt. 63-6 at 14.) In such a case, the ARUS conducting the assessment *944 could proceed in one of two ways. First, she could make a "judgment call" and override one of the scores, leaving the inmate to be categorized based on the other score.[2] (Id. ) In order to proceed with an override, the MDOC PREA manual required the ARUS to have a "compelling reason" for doing so. (Dkt. 66-2 at 2.) An ARUS without a compelling reason for an override would instead leave the decision to a "collaborative team effort" consisting of "health care staff, mental health care staff, an inspector or custody supervisor, and a RUM or ARUS." (Id. )
When an initial PREA assessment of all prisoners was conducted at JCF, it categorized both Rueckert (Dkt. 56-2 at 2) and plaintiff as potential victims. (Dkt. 56-1 at 2.) On November 8, 2013, ARUS Phillips reevaluated Rueckert's PREA status because she "didn't agree with the last assessor's assessment." (Dkt. 63-6 at 4.) Phillips' re-assessment of Rueckert identified him as both a potential victim and a potential aggressor. (Id. at 5.) Rueckert was ultimately categorized as a potential victim. (Dkt. 56-2 at 2.) Phillips testified that she did not override the result to categorize Rueckert as a potential victim, and it is unclear from the record who made the final call. (Dkt. 63-6 at 5-6.) But, on the handwritten portion of the form, Phillips wrote in a box titled "Override Compelling Rationale" that Rueckert "overpowers younger victims is timid amidst peers more equal to his size and weight." (Dkt. 56-2 at 2.) Because Rueckert was ultimately classified in the online system as a potential victim, it made it possible for him to be placed in the same cell as another potential victim, such as plaintiff. (Dkt. 65-2 at 5.)
Defendants now move for summary judgment on each of plaintiff's claims.
II. Legal Standard
Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For this showing, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. at 249, 106 S.Ct. 2505 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co. , 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ). In other words, courts ask whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250, 106 S.Ct. 2505. In making this inquiry, the Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co. , 95 F. App'x 132, 135 (6th Cir. 2004) (citing Skousen v. Brighton High Sch. , 305 F.3d 520, 526 (6th Cir. 2002) ).
III. Analysis
Defendants bring this motion for summary judgment, arguing they are protected from plaintiff's Eighth Amendment claims by qualified immunity, and plaintiff *945 abandoned his Fourteenth Amendment and "acting in concert" claims. Plaintiff responds by setting forth three separate theories of how defendants violated his clearly established constitutional rights. First, plaintiff alleges that defendants, specifically defendants Phillips, McCabe, and Brown-Brandon, were deliberately indifferent to the risk created by placing an inmate who scored as a potential aggressor on his PREA assessment in segregated housing with an inmate who scored as a potential victim. Second, plaintiff alleges that he informed defendants Madery, Swain, Warner, Warren, and Haas that he felt threatened and in danger while housed with Rueckert. Third, plaintiff alleges that Haas' policy for responding to kites sent to him and failing to abide by the PREA compliance policy set out by MDOC demonstrates his deliberate indifference to a "longstanding, pervasive, [and] well-documented" risk of prisoner rape. See Farmer , 511 U.S. at 842, 114 S.Ct. 1970.
For the reasons set forth below, the Court denies summary judgment as to defendants Madery, Swain, Warner, and Phillips. The Court grants summary judgment in favor of defendants Haas, Brown-Brandon, McCabe, and Warren.
A. Eighth Amendment Claims
Plaintiff brings his Eighth Amendment claims under 42 U.S.C. § 1983, and defendants assert a defense of qualified immunity. The Supreme Court outlined the two part analysis for qualified immunity in Saucier v. Katz , 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). One part of the analysis instructs the Court ask whether "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right[.]" Id. at 201, 121 S.Ct. 2151. In the other part of the analysis, courts ask "whether the [allegedly violated] right was clearly established." Id. The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. There is no rigid order in which this test must proceed. Pearson v. Callahan , 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.
Here, there is no dispute that "the constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation." Bishop v. Hackel , 636 F.3d 757, 766 (6th Cir. 2011). The main issue in dispute in this case is whether defendants violated plaintiff's Eighth Amendment rights.
The government violates an individual's Eighth Amendment rights when government actors are "deliberately indifferent" to a "substantial risk of serious harm." Farmer v. Brennan , 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Sixth Circuit applies this test as a two-part analysis containing both an objective and a subjective component. See, e.g. Bishop , 636 F.3d at 766 ; Mangum v. Repp , 674 F. App'x 531, 537 (6th Cir. 2017) ; Greene v. Bowles , 361 F.3d 290, 294 (6th Cir. 2004). The objective component of the test asks whether plaintiff "was exposed to a substantial risk of serious harm to his safety." Mangum , 674 F. App'x at 537 (quoting Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ) (internal quotations removed). The subjective component asks whether the defendant official was "aware of the facts from which the inference could be drawn that a substantial risk of harm exists," actually "dr[e]w the inference," and disregarded it. Bishop , 636 F.3d at 766-67 *946 (quoting Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ) (internal quotations removed).
1. Objective Component
The objective component of the Eighth Amendment analysis asks whether an inmate was "incarcerated under conditions posing a substantial risk of serious harm." Mangum , 674 F. App'x at 537 (quoting Curry v. Scott , 249 F.3d 493, 506 (6th Cir. 2001) ).
The Sixth Circuit has held that a "reasonable corrections officer" would be on notice that placing "a young, small" inmate in a cell with "an older, stronger, and predatory inmate" would put the former "in grave danger" sufficient to satisfy the objective component of the Eighth Amendment analysis. Bishop , 636 F.3d at 766. The Sixth Circuit recently reaffirmed that decision, finding that incarcerating an inmate who is particularly vulnerable to sexual assault "in a small unit with a convicted sex offender" exposed that inmate to an objectively serious risk of harm. Mangum , 674 F. App'x at 537.
In addition, at least one panel of the Sixth Circuit has evaluated the objective component of the Eighth Amendment analysis retrospectively. See Curry , 249 F.3d at 506. In that case, the very fact that the inmates experienced the harm complained of was enough for the panel to find the inmates were "incarcerated under conditions posing a substantial risk of serious harm." Id. (finding "the harm alleged by all plaintiffs ... is sufficiently serious to fulfill the objective component of this definition"). In other words, the court did not look to the risk of harm to which officials allegedly exposed plaintiffs, but rather to the seriousness of the actual harm plaintiffs suffered.
Under either of these applications of the standard, plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." See Mangum , 674 F. App'x at 537. Plaintiff-a twenty-two year old, 130 pound man-was a "young, small" inmate housed with Ruekert-a twenty-seven year old, 234 pound man-who was an "older, stronger, and predatory" inmate as well as "a convicted sex offender." See Bishop , 636 F.3d at 766 ; Mangum , 674 F. App'x at 537. Like the similar circumstances in both Bishop and Mangum , such a cell assignment placed plaintiff "in grave danger" and satisfies the objective component of this analysis. See id. What is more, applying the precedent in Curry , the fact that plaintiff was actually raped is sufficient to demonstrate that he was exposed to a substantial risk of serious harm. See Curry , 249 F.3d at 506. Prison sexual assault "is sufficiently serious to fulfill the objective component" of the Eighth Amendment analysis. See Id.
Accordingly, the objective component of the Eighth Amendment analysis is satisfied.
2. Subjective Component
In addition to showing that plaintiff was exposed to a substantial risk of serious harm, McCracken must also demonstrate that defendant prison officials were deliberately indifferent to that risk. See Farmer , 511 U.S. at 834, 114 S.Ct. 1970.
The deliberate indifference analysis can be broken out into three discrete questions: whether (1) defendant was "aware of facts" from which he or she could draw an inference that plaintiff was exposed to a "substantial risk of serious harm," (2) defendant actually drew the inference, and (3) defendant disregarded the risk. Mangum 674 F. App'x at 537 (quoting Farmer , 511 U.S. at 837, 114 S.Ct. 1970 ).
In establishing this standard in Farmer , the Supreme Court explained the type of showing a plaintiff must make to establish deliberate indifference. Deliberate indifference is a "question of fact subject to demonstration in the usual ways, including inference *947 from circumstantial evidence, [ ] and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer , 511 U.S. at 842, 114 S.Ct. 1970 (citations omitted). The Court added that "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and circumstances suggest[ing] [ ] the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it" also inform the deliberate indifference inquiry. Id. (internal quotation marks removed). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. at 843, 114 S.Ct. 1970.
Prison officials may defend against claims of deliberate indifference by showing "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer , 511 U.S. at 844, 114 S.Ct. 1970. A prison official may also be "free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id.
On balance, the deliberate indifference analysis is "fact-bound and dependent on both witness credibility and those inferences that a jury can reasonably draw from the relevant circumstances." Doe v. District of Columbia , 215 F.Supp.3d 62, 77 (D.D.C. 2016). This inquiry "is therefore ill-suited for summary judgment in all but the clearest cases." Id.
When a plaintiff brings Eighth Amendment claims against multiple defendants asserting qualified immunity defenses, "the subjective component of a deliberate indifference claim must be addressed for each officer individually." Phillips v. Roane Cty., Tenn. , 534 F.3d 531, 542 (6th Cir. 2008) (quoting Garretson v. City of Madison Heights , 407 F.3d 789, 797 (6th Cir. 2005) ) (internal quotations and formatting removed).
i. Hilary Madery
Plaintiff alleges he sent a kite to Madery, an ARUS in the cell block where plaintiff and Rueckert were housed, expressing that he felt unsafe in a cell with Rueckert. Defendants argue that there is no evidence that Madery ever received the kite, and that she "had insufficient personal involvement to be liable[.]" (Dkt. 54 at 16.)
More specifically, plaintiff testified in his deposition "I wrote two of them kites, one to the warden, one to the RUM [Madery], and I got the one back from the RUM."[3] (Dkt. 58-1 at 10; see also Dkt. 72.) According to plaintiff, the kites addressed to Madery and the warden's office were identical, and he wrote an additional copy to keep for himself. (Dkt. 58-1 at 11.) Plaintiff sent the kite by the normal process, in which inmates would "hand them to officers *948 and [the] officers [would] put them in the kite box." (Dkt. 58-1 at 10.) Madery later "responded to [the kite] and she stated you are on the list to be transferred[.]" (Id. at 10.) Plaintiff "believed [the response] did" have Madery's signature on it. (Id. )
Plaintiff's testimony about the kite process is consistent with Madery's. According to Madery, she "tried to" review the kites on a daily basis, and "two days would be the most" time it would take her to review and respond to a kite. (Dkt. 59-2 at 15.) Madery would "answer" and "return" each kite, which involved writing on the actual document the inmate sent to her. (Id. )
Madery bases her defense on the fact that plaintiff only produced one copy of the kite in question addressed to "Warden's office" rather than her personally, and could not produce a copy of the response. (Dkt. 54 at 8-9.) Plaintiff testified that he could not produce a copy of the kite with Madery's response because he thinks it was removed from his cell with his bedding and other personal effects after the January 5 rape. (Dkt. 58-1 at 11.) However, at no point in her deposition did Madery testify that she never received or responded to a kite sent by plaintiff. When asked if she could "recall any communication from [plaintiff] while he was on I unit" she replied "no." (Dkt. 59-2 at 16.)
Regardless of how the Court interprets Madery's inability to recall any communications with plaintiff (i.e. as a denial of any communication or an inability to recall whether there was any communication), summary judgment in her favor must be denied. A rational juror could believe plaintiff's version of events-in which he sent Madery a kite expressing that he felt being in a cell with Rueckert endangered him and Madery responding by telling him that he was on a list to be transferred-or Madery's version of events, in which no such kite existed. Therefore, there is a genuine dispute of a material fact as to whether Madery was on notice of the potential threat and disregarded that threat. Summary judgment in favor of Madery is denied.
ii. LaTonya Phillips
Defendant Phillips was an ARUS at JCF while plaintiff was housed in a cell with Rueckert. (Dkt. 60-4 at 7.) On November 8, 2013, as part of her duties as an ARUS, Phillips conducted a new PREA assessment of Rueckert because she "didn't agree with the last assessor's assessment." (Dkt. 63-6 at 4.) Phillips' new assessment found that Rueckert was both a potential aggressor and a potential victim for PREA purposes. (Id. )
Plaintiff argues that Phillips is not entitled to summary judgment because she was aware from her PREA assessment that Rueckert was a potential aggressor and did not take steps within her power to ensure that he was categorized in the OMNI[4] database as such. She failed to take these steps despite testifying that she knew Rueckert was convicted of sex crimes, recognizing that he "overpowers younger victims is timid amidst peers more equal to his size and weight," and being aware that if he was ultimately categorized as a potential victim he could be placed in a cell with other potential victims. (See Dkt. 56-2 at 2; Dkt. 63-6 at 7-8.)
Housing someone like Rueckert in the same cell as a potential victim of sexual violence is the very situation PREA assessments seek to prevent. (See Dkt. 58 at 26.) By allowing this to happen, Phillips created a risk for any inmate designated as a potential victim who may be housed in *949 the same cell as Rueckert, and disregarded that risk by failing to flag Rueckert's aggressor status. See Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ("[I]t does not matter whether ... a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."). However, the situation presents such a close call because it is not clear whether Phillips was in some way responsible for the failure to flag Rueckert as an aggressor in the OMNI database. (See Dkt. 63-6 at 15-16.)
Phillips testified that when a PREA assessment returns a score of both aggressor and victim the person doing the assessment "make[s] a judgment call on which one [she] thinks is more likely." (Id. at 14.) Phillips made these judgment calls from time to time in her PREA assessments. (Id. ) However, when shown screen shots of the specific PREA assessment at issue here, Phillips testified "I see that I didn't put any results in here and there's nothing in OMNI to show that I put anything in here to make a decision." (Id. at 16.)
When faced with this situation, MDOC policy only allowed one of two responses. The 2013 PREA Risk Assessment Manual indicates that in situations where a prisoner receives a conflicting score, the "staff member completing the assessments may override either finding if there is a compelling reason(s) to support the override." (Dkt. 66-2 at 1.) The manual goes on to add that in "cases where the staff person completing the assessment does not have compelling information to override either score, a collaborative team effort will be made to determine the appropriate override and Overall PREA Designation." (Id. ) The team is to be made up of "health care staff, mental health care staff, an inspector or custody supervisor, and a RUM or ARUS." (Id. ) Phillips testified she was not part of this "collaborative team effort" and that it was conducted by people above her level. (Dkt. 63-6 at 15.)
It appears that Phillips did identify compelling reasons to override the disparate findings in her PREA assessment of Rueckert, even though she failed to enter the override. (Dkt. 63-5 at 3.) The "PREA Risk Assessment" worksheet Phillips filled out for Ruekert on November 8, 2013 lists both the "Aggressor Assessment Finding" and "Victim Assessment Finding" as "Override Finding." (Id. at 2.) On the next page, under a heading for "Override Compelling Rationale" is a handwritten note that reads "[o]verpowers younger victims is timid amidst peers more equal to his size & weight." (Id. at 3.) However, the "Overall PREA Designation" box is blank.
Though it is not clear exactly who made the decision to designate Rueckert as a potential victim without flagging that he also scored as a potential aggressor, a rational juror could evaluate this evidence and find that Phillips knew of and disregarded a substantial risk to inmate safety when she failed to override Rueckert's overall PREA designation to aggressor. The Supreme Court made clear "it does not matter whether ... a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Farmer , 511 U.S. at 834, 114 S.Ct. 1970 ; see also Curry , 249 F.3d at 507 (the "actual knowledge" standard for deliberate indifference claims "does not require that a prison official know a prisoner would, with certainty, be harmed, or that a particular prisoner would be harmed in a certain way"); Taylor v. Michigan Dept. of Corrections , 69 F.3d 76, 81 (6th Cir. 1995) ("the correct inquiry is whether he had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be").
*950 Here, the risk posed by allowing Rueckert, a 240 pound convicted sexual predator, to be in the same cell as an inmate designated as a potential victim of sexual violence was not just a risk to plaintiff personally, but rather to all identifiable potential victims as well as potential victims who Rueckert may have been housed with. As noted by the Curry court, it does not matter that Phillips did not know harm would befall an inmate as a result of Rueckert's designation; it only matters that she understood there to be such a risk. See Curry , 249 F.3d at 507. Phillips' handwritten note on Rueckert's assessment form could lead a rational juror to determine that she appreciated the risk and disregarded it by failing to ensure that Rueckert was formally designated as a potential aggressor. For these reasons, there is a genuine dispute of material fact as to whether the actions Phillips took caused Rueckert to be housed with potential victims, causing a serious risk of harm, and therefore summary judgment as to Phillips is denied.
iii. Ernest Swain
Defendant Swain was a corrections officer in the I Unit where plaintiff and Rueckert were housed together, and he took plaintiff to the medical unit immediately after plaintiff was raped. (Dkt. 59-3 at 6.) Plaintiff alleges Swain did nothing after he personally informed Swain of the threat he perceived from Rueckert. Swain's defense rests on the fact he "was not even aware of an alleged sexual assault ... until after the incident occurred," and he "disputes that McCracken ever informed him that he faced a substantial risk of serious harm." (Dkt. 54 at 17.) Summary judgment against Swain is not proper because plaintiff has carried his burden of demonstrating a genuine dispute of material fact as to Swain's knowledge of the risk of harm.
In his deposition, plaintiff testified that "[s]omewhere between ... the 27th [of December, 2013] to the 5th [of January, 2014]" he verbally informed Swain that he was "in fear of Mr. Rueckert." (Dkt. 58-1 at 15.) He did so "several" times. (Id. ) When plaintiff asked Swain to do something about it, Swain responded "[y]ou're on the list to be transferred." (Id. ) Swain "never offered to place [plaintiff] in a different cell or ... a single cell." (Id. )
When asked, Swain could not recall much of anything. He remembered that McCracken had a prosthetic leg, but could not recall the rape, even though he transferred plaintiff to the medical unit immediately after it took place.[5] (Dkt. 59-3 at 12.) Swain did not recall any other conversations with plaintiff. (Id. at 13-14.)
The Sixth Circuit has held that a "plea for help" made to a specific corrections officer is sufficient to establish that corrections officer's knowledge for Eighth Amendment purposes. Amick v. Ohio Dept. of Rehab. and Corr. , 521 F. App'x 354, 363 (6th Cir. 2013) ; Rodgers v. Chapleau , 238 F.3d 423, 2000 WL 1785837, at *4 (6th Cir. 2000) (per curiam) (unpublished) (finding a genuine issue of material fact that a corrections officer "was aware of a serious risk of harm to [plaintiff] and that he consciously disregarded it" when testimony indicated that plaintiff twice told a corrections officer that he intended to kill himself and the corrections officer "failed to take the comments seriously"); cf. Bishop , 636 F.3d at 768-69 (ordering summary judgment for defendant corrections officers when plaintiff "does not recall which corrections officers he complained to, [ ] is unable to describe the *951 corrections officers that he complained to, and [ ] does not remember when or how many times he complained"). Here, plaintiff testified he made a "plea for help" to Swain by telling him "several times" between December 25, 2013 and January 2, 2014 that he was "in fear of Mr. Rueckert." See Amick , 521 F. App'x at 363.
Unlike the plaintiff in Bishop , who could not identify the corrections officer he complained to, when he complained, or how often he complained, plaintiff here specifically identified Swain and Warner as corrections officers he expressed his fear to, identified the time frame of the complaint, and that he complained "several times." See Bishop , 636 F.3d at 768-69. Moreover, plaintiff has raised a question of fact as to whether Swain disregarded the risk that plaintiff identified by merely informing plaintiff that he was on a list to be transferred instead of separating plaintiff and Rueckert.
Because a rational juror could find that Swain was aware of a substantial risk of harm to plaintiff and disregarded that risk, he is not entitled to summary judgment.
iv. Douglas Warner
Warner, along with Swain, was a corrections officer in I Unit when plaintiff and Rueckert were housed there together. (Dkt. 59-4 at 7.) As with Swain, when plaintiff was asked if he "specifically communicat[ed] to Mr. Warner that [he was] in fear that Mr. Rueckert would harm" him, plaintiff answered "yes." (Dkt. 58-1 at 18.) Plaintiff "spoke with [Warner] through the door on quite a few occasions" about his fear of Rueckert, and Warner responded by telling him "you're in protective custody, what more do you want." (Id. ) Warner also suggested to plaintiff that he "would talk to the lieutenant or the sergeant" about plaintiff's issue, but it is not clear whether he ever did. (Id. at 18.)
Warner testified that he "barely remember[ed]" plaintiff or Rueckert, and at no point explicitly disputed plaintiff's testimony that plaintiff warned him of the danger he felt. (Dkt. 59-4 at 15-16; 20.)
Taking the facts in the light most favorable to plaintiff, he made a "plea for help" to Warner, and Warner did not do anything in response. See Amick , 521 F. App'x at 363. A rational juror could find that such a plea is sufficient to establish that Warner was aware of and disregarded a substantial risk to plaintiff's safety. Thus, summary judgment in favor of Warner is denied.
v. Randall Haas
Haas was the warden in charge of JCF during plaintiff's time there. (Dkt. 59-6 at 4.) Plaintiff alleges that Haas is liable under the Eighth Amendment for two reasons. First, even though there is no evidence to show that he received plaintiff's January 2, 2014, kite sent to "Warden's Office," Haas' system of delegating all kites to his secretary or administrative assistant itself violated the Eighth Amendment. Second, the prison's compliance with PREA's mandates, as a whole, was insufficient and created a substantial risk of harm.
For the first theory, plaintiff proffers expert testimony from Ronald McAndrew, a former prison warden in Florida and California, who testified that, based on his own experience, Haas' failure to personally read the kites addressed to him created a substantial risk of harm to all inmates in the prison. (Dkt. 61-12 at 14.) Haas offers no response to the expert's testimony, and argues only that there is no evidence in the record to support an inference that Haas was subjectively aware of plaintiff's complaints and fear. (Dkt. 54 at 15.)
Taking the evidence in the light most favorable to plaintiff as the non-moving party, no rational juror could find that Haas' failure to read the kites sent to him *952 made him deliberately indifferent to a substantial risk of harm to inmates.
" Section 1983 liability will not be imposed solely upon the basis of respondeat superior." Bellamy v. Bradley , 729 F.2d 416, 421 (6th Cir. 1984). Instead, plaintiff must show that Haas "personally had a job to do, and he did not do it" and that this failure "resulted directly in a violation of the plaintiff's Eighth Amendment right." Taylor , 69 F.3d at 81. In Taylor , the Sixth Circuit held a prison warden liable for an inmate's rape because the warden failed to "adopt reasonable policies to insure that the transferees were not placed in grave danger of rape." Id. Crucial to that case was the fact that the warden was "charged with abandoning the specific duties of his position-adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers-in the face of actual knowledge of a breakdown in the proper workings of the department." Id.
The record in this case indicates that it is distinguishable from Taylor because there is no evidence that Haas failed to do his job. The record does not show that Haas failed to read and respond to kites, as plaintiff suggests. Haas testified that his "secretary or administrative assistant" would screen the kites for him, and would "refer it back to a department head" if it was a "simple issue." (Dkt. 59-6 at 7.) Otherwise, he would read the kite himself. (Id. ) This is not an example of a person with a "job to do" who "did not do it." See Taylor , 69 F.3d at 81. Instead, plaintiff's allegations describe an administrator who, for the sake of efficiency, delegated some work to his staff while ensuring that he would give his attention to any aspect of that work that needed it.
The second theory, that Haas failed to ensure compliance with PREA and was therefore aware of a substantial risk of serious harm to all inmates, is also unsupported by the record. Plaintiff alleges that Haas did not adequately supervise the PREA compliance process, which required the warden to delegate PREA compliance to a PREA coordinator. (Dkt. 61-1 at 6.) Haas appointed a PREA coordinator as required (there was more than one PREA coordinator at JCF between 2013 and 2014), and the statewide PREA administrator, Jennifer Polhemus, testified that she was in contact with each JCF PREA coordinator during her time in the role. (Id. ) What is more, the record indicates that JCF officials began implementing PREA and assessing prisoners under its metrics as soon as the federal statute required them to. As such, no rational juror could find that Haas failed to do his job with respect to PREA compliance. See Taylor , 69 F.3d at 81.
For these reasons, Haas did not violate plaintiff's constitutional rights and is entitled to qualified immunity.
vi. Cascelia Brown-Brandon
Brown-Brandon, as the Deputy Warden for Housing, was one of the two defendants who conducted the SCC review of Rueckert's housing assignment. Plaintiff alleges that she, along with RUM McCabe, should not have allowed Rueckert to return to the cell he shared with plaintiff after conducting a security screening because the "counselor file" they used in conducting that screening contained Rueckert's PREA evaluation, which should have alerted Brown-Brandon to the fact that a potential aggressor was currently housed in a single cell with a potential victim. (Dkt. 58 at 26.) In addition, plaintiff testified that he sent a kite to Brown-Brandon informing her of the danger he perceived from Rueckert and asking for help. (Dkt. 58-1 at 8-9.)
The record does not support plaintiff's claims. First, it was not Brown-Brandon's role in the SCC process to directly review the contents of the counselor file. ( *953 Dkt. 63-1 at 3 ("We review the file while we're [at the SCC meeting], but the RUM of segregation usually is the one who does all the prep ...").) When she did review the file, she did so only for "relevant documents." (Dkt. 78-2 at 3.) "The relevant documents from the prisoner's counselor file depend on why the prisoner was in segregation," and typically "included documents that gave an overview of the prisoner's behavior such as protection requests/decisions, transfer orders, and misconducts." (Id. ) What is more, SCC members "would not have been looking at PREA assessments" because the SCC did not serve "to determine if [prisoners] were properly designated under PREA." (Id. )
Second, there is no testimony or other evidence demonstrating that Brown-Brandon ever received the kite that plaintiff allegedly sent her. Plaintiff testified "I wrote two of them kites, one to the warden, one to the RUM [Madery], and I got the one back from the RUM."[6] (Dkt. 58-1 at 10.) In other words, plaintiff claims to know that Madery received his kite because he received a response, but does not know whether Brown-Brandon received the kite he brought to the deposition, as it was addressed generally to "Warden's Office." (See Dkt. 72-1.) Brown-Brandon testified that she received kites from prisoners "occasionally" in her daily mail, but did not indicate whether she received one from plaintiff. (Dkt. 59-1 at 8-9.)
The record does not contain sufficient evidence for a reasonable juror to conclude that Brown-Brandon was aware of the risk to plaintiff, she was not deliberately indifferent to that risk, and summary judgment in her favor is appropriate.
vii. Vicki McCabe
RUM McCabe was the other official involved in Rueckert's SCC review, along with Brown-Brandon, and the allegations against her are substantially the same. According to plaintiff, McCabe "allowed Rueckert to remain in the cell with plaintiff [after reviewing Rueckert's file], even though plaintiff was known to be a potential sexual assault victim and Rueckert a potential sexual assault aggressor." (Dkt. 58 at 26.)
A review of Rueckert's counselor file reveals that it could not have made McCabe aware of the risk Rueckert posed to plaintiff.[7] Though the counselor file contains *954 Rueckert's PREA assessment designating him as both a potential victim and a potential aggressor, it does not contain any indication that he was ultimately housed as a potential victim. Absent information that Rueckert scored as a potential aggressor but was housed as a potential victim, McCabe could not have been aware that Rueckert posed a threat to his cellmate. Even though the PREA assessments were in the counselor file, McCabe does not recall ever seeing one in the file, telling counsel that the PREA assessments were "possibly" in the file, but that she "[didn't] know for sure." (Dkt. 62-4 at 10.) Plaintiff presents no contrary evidence to show that McCabe was aware of the substantial risk of harm posed by Ruekert, and, without such awareness, she could not have been deliberately indifferent to that risk. See Farmer , 511 U.S. at 837, 114 S.Ct. 1970. McCabe is therefore entitled to summary judgment.
viii. Shawn Warren
Warren was the third corrections officer on I Unit during the time that plaintiff and Rueckert were housed there, along with Warner and Swain. (Dkt. 59-5 at 5.) According to plaintiff, Warren "is another officer that I made aware of the situation." (Dkt. 58-1 at 18.) However, unlike with Swain and Warner, plaintiff offers no testimony indicating he specifically informed Warren that he felt he was in danger from Rueckert. (See id. at 18-19.) For this reason, even taking the facts in the light most favorable to plaintiff, a rational juror could not find that Warren was aware of a substantial risk to plaintiff and ignored that risk.
Warren, unlike Swain or Warner, remembered plaintiff and presented a very different picture of plaintiff's time in I Unit with Rueckert. According to Warren, "McCracken and Rueckert ... acted like brothers inside the cell, like they'd been family and known each other." (Dkt. 59-5 at 17.) He added that they "like to play games" where "[o]ne of them would stand in the doorway with his hands on the door while the other one slammed the locker and they would go, 'It's not me. It's not me.' " (Dkt. 59-5 at 20-21.)
For the reasons set forth above, defendants Madery, Phillips, Swain, and Warner are not entitled to qualified immunity on plaintiff's Eighth Amendment claims. Defendants Haas, Brown-Brandon, McCabe, and Warren are entitled to qualified immunity for these claims.
B. Fourteenth Amendment Claim
In their motion, defendants state that they read the complaint to allege causes of action for the same incident under both the Fourteenth and Eighth Amendments. Because plaintiff's claim is properly brought under the Eighth Amendment, his Fourteenth Amendment claims cannot go forward.
Where there is "an explicit textual source of constitutional protection against ... governmental conduct, that Amendment, not the more generalized notion of 'substantive due process' [in the Fourteenth Amendment] must be the guide for analyzing these claims." Graham v. Connor , 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Sixth Circuit has explicitly applied this reasoning to pleadings seeking relief under both the Eighth and Fourteenth Amendments. Walker v. Norris , 917 F.2d 1449, 1455 (6th Cir. 1990) (quoting Graham and finding its "line of *955 reasoning equally forceful in the context of claims arising under the Eighth Amendment."). Thus, plaintiff's Fourteenth Amendment claim is dismissed.
C. Gross Negligence and Acting in Concert Claims
In addition to Eighth and Fourteenth Amendment claims, plaintiff pleaded claims for gross negligence and acting in concert. (Dkt. 34 at 12-13.) Defendants move for summary judgment on both of those claims (Dkt. 54 at 19-23) and plaintiff does not respond with any defense of those claims. (Dkt. 58.) In the Sixth Circuit, a plaintiff is deemed to have abandoned a claim when he fails to address it in response to a motion for summary judgment. Brown v. VHS of Mich., Inc. , 545 F. App'x 368, 372 (6th Cir. 2013) (citing cases). Accordingly, plaintiff's gross negligence and acting in concert claims are dismissed as abandoned.
IV. Conclusion
For the reasons set forth in this opinion, the Court GRANTS summary judgment to all defendants on plaintiff's Fourteenth Amendment, gross negligence, and acting in concert claims. The Court additionally GRANTS summary judgment for defendants Haas, Brown-Brandon, McCabe, and Warren on plaintiff's Eighth Amendment claims. Summary judgment is DENIED for defendants Madery, Phillips, Swain, and Warner on plaintiff's Eighth Amendment claims.
IT IS SO ORDERED.

Kites are internal mail prisoners can send to prison officials. Typically, they are used to express grievances both large and small.

For example, if an inmate's PREA assessment designated him both as potential victim and potential aggressor, the ARUS conducting the assessment could either override the potential victim score and designate the inmate as a potential aggressor or override the potential aggressor score and designate the inmate a potential victim.

Though Madery was an ARUS and not a RUM, plaintiff thought she was a RUM and specifically identified her as the recipient of this kite:
Q: Are there any other kites that I should be concerned about out there that you wrote to anyone else?
A: That one and Madery-or the RUM, I believe her name was Madery.
...
Q: Was it addressed to Ms. Madery then?
A: Yes.
(Dkt. 58-1 at 10.)

The OMNI database was JCF's internal prisoner information management system.

Plaintiff complained of having chest pains and did not immediately reveal that he was raped when he asked to go to the medical unit. (Dkt. 59-3 at 11.)

In their brief, defendants argue the kite in question was addressed to "Warden's office," and thus was intended for Haas, not Brown-Brandon. (Dkt. 54 at 8.) Plaintiff adopts the same posture in his brief. (Dkt. 58 at 24.) However, plaintiff's deposition testimony indicates that the kite may have been intended for Brown-Brandon:
Q: What contact did you have with Ms. Brown-Brandon that you believe alerted her that you were being threatened by Mr. Rueckert?
A: I wrote her a kite.
Q: Is this the kite that ... you brought with you today?
A: Yes.
(Dkt. 58-1 at 9.) Plaintiff was later asked "[d]o you have any other evidence to point that Mr. Haas was actually aware of the problems you had with Mr. Rueckert?" (Id. at 13.) He responded "[o]ther than that kite, no." (Id. ) It is not clear to whom plaintiff intended the kite to go, but, regardless, there is no evidence in the record to indicate that either Brown-Brandon or Haas ever received it.

In the course of this litigation, plaintiff requested Rueckert's counselor file from MDOC, and he has made MDOC's entire production available on the record. (Dkt. 76-3.) That production shows that the results of Rueckert's PREA assessments were part of the counselor file, contrary to McCabe and Brown-Brandon's testimony. (See Dkt. 62-4 at 7 (McCabe); Dkt. 78-2 at 4 (Brown-Brandon).)
After hearing oral argument on this motion on December 18, 2017, the Court issued an order for supplemental briefing requesting the parties provide information "detailing the contents of the 'Counselor File' that Security Classification Committee members would have had in their possession during a prisoner's review." (Dkt. 73.) Defendants' brief was not responsive to the Court's order, and, rather than address the requested issues, asks the Court to strike plaintiff's affidavit submitted along with his brief. (Dkt. 78.) The Court declines to do so. In light of defendants' failure to respond to the December 18 order, the Court will assume to be true plaintiff's assertion that the PREA assessment was a part of the counselor file.